**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**

**D.D. ex rel. J.D.D.,**

**Plaintiff(s)**

CASE NO. 3: 25-cv-530



**v.**

**TENNESSEE NATURE ACADEMY**
**(A State Public Charter School)**

**TENNESSEE PUBLIC CHARTER SCHOOL COMMISSION,**
**TENNESSEE DEPARTMENT OF EDUCATION,**
**R. JAY RENFRO,**
**ASHLEY THOMAS,**
**TESS STOVALL,**
**SARAH SAVAGE,**
**JOSHUA JOHNSON,**
**ALICIA HERRERA,**
**BRENDA JONES,**
**SCOTT CAMPBELL,**
**SHAUNDRAYA HERSEY,**
**JOSSELYNE BLACKARD,**
**TAYLOR JENKINS,**
**CHRISTY BALLARD,**
***+ADDITIONAL ANONYMOUS DEFENDANTS***
***ON TNA DISCIPLINARY HEARING AUTHORITY, TBD,***
***+ADDITIONAL ANONYMOUS DEFENDANTS***
***ON TNA BOARD OF DIRECTORS, TBD,***

**Defendants.**                                    **Jury Trial Requested**

---

## COMPLAINT

---

### The Nature of the Case

1. This is a *pro se* action by an African American father and son seeking equitable, injunctive, and monetary relief, and justice, regarding a public charter school, its founder and executive director, and other state actors all of whom are not black males, for a

1

**COMPLAINT**
**D.D. ex rel. J.D.D. v. Tennessee Nature Academy**
Case 3:25-cv-00530    Document 1    Filed 05/08/25    Page 1 of 57 PageID #: 1

wrongful "expulsion", by the white principal of a state public charter school against a black boy, based on a false-charge against him of and a rush-to-judgment against him on *"sexual harassment" in the 5th grade*, concerning a girl of east Indian descent, all done as a deliberately gaslighting form of *"disability harassment" against the black boy* as a bright, capable twice-exceptional (ADHD/ASD) African American male K-12 student as well as a form of discrimination based on his race (black) and gender (male), along with his color (complexion), and even his **nationality as an American** born-and-raised, as a direct descendant of enslaved persons in the United States. Plaintiff(s) D.D. is suing Defendants all of whom are not black men, as "next friend" of J.D.D. (JD), for their documented discrimination and dereliction of duty as defendant state actors with state jobs, against both persons jointly and coincidedly, as an African American Dad advocating for the Education of his proudly black son.

## The Jurisdiction and Venue

2. Jurisdiction in this case is a federal question of civil rights, pursuant to 28 USC 1331.

3. Venue is proper in this judicial district because all events arose within the Middle District of Tennessee, pursuant to 28 USC 1391(b)(2).

## The Plaintiff(s) and Defendants

4. Plaintiff(s) D.D. is suing as "next friend" of J.D.D. (JD).

5. Defendant Tennessee Nature Academy (TNA) is a state public charter school.

6. Defendant Tennessee Public Charter School Commission (TPCSC) is the primary local educational agency (LEA) for TNA.

7. Defendant Tennessee Department of Education (TNDOE) is the secondary local educational agency (LEA) for TNA. TNDOE is contractually obligated to provide funding for TNA via TPCSC, as a pass-through entity for TNA, pursuant to paragraph 2.3.2 of The Charter Agreement. TNDOE has direct jurisdiction over the principal, executives, and licensed teachers employed by TNA, including assessing the effectiveness of Title IX, TCA 49-6-1304, and of other compliance training programs provided to these regulated persons responsible to all students such as JD. TNDOE has direct jurisdiction overseeing the professional performance and conduct of these TNDOE-licensed persons including defendants Renfro, Johnson, Herrera, Savage, Jones, and Campbell, and others, pursuant to TCA 49-5-108(c) and (f)(1). TNDOE also has concurrent jurisdiction under federal laws to protect the rights of JD, particularly due to the dereliction of regulatory duty by TPCSC, particularly the erroneous waiver of its

2

**COMPLAINT**
**D.D. ex rel. J.D.D. v. Tennessee Nature Academy**
Case 3:25-cv-00530    Document 1    Filed 05/08/25    Page 2 of 57 PageID #: 2

TCA 49-6-1304 and TCA 49-6-1306 jurisdiction, within the July 1 , 2024 letter of defendant Thomas.

8. Defendant Roy Jay ("Mr. Jay") Renfro is the Founder and Director of Tennessee Nature Academy.

9. Defendant Ashley Thomas is General Counsel for TPCSC.

10. Defendant Tess Stovall is Executive Director of TPCSC. Defendant Stovall failed to investigate TNA upon the request of Plaintiff(s), as detailed in the following paragraphs, despite the public record of defendant Stovall having been opposed to the approval of TNA as a state charter school, as quoted by NPR,

    (Stovall) citing (TNA's) "uncertain, unpredictable finances."
    (of Tennessee Nature Academy)
    Stovall said that grants outlined in the charter's amended application failed to materialize. Her recommendation also raised concerns about a lack of financial expertise in the internal leadership team.
    Additionally, Stovall wrote, "I have concerns as to whether the sponsor will be able to properly recruit and retain teachers for their unique model in a way that serves all special populations with the projected salaries allocated within the budget."
    She said the average salary for general education teachers in the charter school's budget was low compared to MNPS pay, around $51,000. And teachers for special education and English learners were budgeted to be paid about $41,000 on average.
    ("**State charter commission approves Tennessee Nature Academy, overriding MNPS board**", Alexis Marshall, NPR, October 18, 2022)

11. Defendant Sarah Savage is essentially the co-founder of TNA serving as its Chief Academic Officer (and "Title IX Coordinator").

12. Defendant Joshua Johnson is the special education teacher for TNA.

13. Defendant Alicia Herrera is a teacher for TNA.

14. Defendant Dr. Brenda Jones is the Founder of Invictus Nashville Charter School serving as Chair of the Disciplinary Hearing Authority for TNA.

15. Defendant Scott M. Campbell is the Founder of both Persist Nashville and Nashville Incubator serving as Chair of the Board of Directors of TNA.

16. Defendant Shaundraya Hersey is Assistant General Counsel for Civil Rights for TNDOE.

17. Defendant Josselyne Bustillo Blackard is Staff Attorney for Civil Rights for TNDOE.

**COMPLAINT**
**D.D. ex rel. J.D.D. v. Tennessee Nature Academy**

18. Defendant Taylor Jenkins is Assistant General Counsel for Special Education for TNDOE.

19. Defendant Christy Ballard is General Counsel for TNDOE.

20. Defendants unknown and therefore unnamed made unlawful decisions (along with the known and therefore named defendants) regarding JD, while serving and making such discriminatory decisions anonymously on their respective committees of TNA, specifically its Disciplinary Hearing Authority and its Board of Directors.

21. All Defendants are either state agencies enjoying zero immunity under the Eleventh Amendment to the United States Constitution, pursuant to 42 USC 2000d-7(a), (1),(2), or, state actors acting under color of law.

## The Background and Facts

22. Plaintiff discovered the promising concept of "Tennessee Nature Academy" on March 30, 2023 from a lawn sign noticed while exercising on the outside track on the public Metro Parks grounds of the **Southeast Community Center** in Antioch, Davidson County, Tennessee located in southeast Nashville: "Free nature-based charter school for grades 5-12 in Davidson County". This interesting marketing moniker on the sign and the innovative educational concepts presented by the webpage provided by the sign were promising for Plaintiff parent seeking a next-level school experience for his son JD, including experiential learning opportunities within an accommodating natural environment of options, because JD is a bright, twice-exceptional student fully eligible for educational disability support and services to accommodate and complement his ADHD/ASD, which disability status is fully documented within his Independent Education Evaluation (IEE) completed by his private providers. JD has long-standing and extensive interests in global cultures, currencies, languages, and STEM, including his prolific artwork on human medical anatomy and other subjects. JD is a very friendly and upbeat child with a highly inquisitive and intelligent mind, who is vocally articulate and proactively seeks global knowledge; however, JD also can be sensitive or awkward within interactive social or competitive sports situations, or argumentative, particularly when wrongfully triggered by others. After winning an MNPS school lottery in 2018, JD had been enrolled at a public school for K-4 in Antioch, Davidson County, Tennessee for five (5) academic years, which included an S-Team, an IEP Team, and other support; therefore, the advertising ground-signage for the Tennessee Nature Academy (TNA) offering a "5-12 in Davidson County" grades opportunity seemed to be excitingly perfect timing for the next step in the educational journey of JD, for his upcoming grades 5-12, because it was not entirely clear at that time whether the K-4 school definitely would add a 5th grade opportunity (which MNPS ultimately later did add-on to the K-4 school). Plaintiff parent attended the Open House at the dual-use site of TNA (which west side of

4

**COMPLAINT**
**D.D. ex rel. J.D.D. v. Tennessee Nature Academy**
Case 3:25-cv-00530    Document 1    Filed 05/08/25    Page 4 of 57 PageID #: 4

the building was still being set-up for a school), on May 18, 2023 along with JD, who was very excited about the nature Academy, even making suggestions to defendant TNA Founder and Executive Director, Jay Renfro (Roy "Mr. Jay" Renfro), for an Academic mascot ("The Frogs") and a Sports mascot ("The Bullfrogs"): *a goat mascot was ultimately selected*. Plaintiff proceeded to complete the steps for the family to become one of the "Founding Families" of Tennessee Nature Academy, as described on the website. JD completed the 3-hour assessment testing on June 15, 2023 and afterwards received TNA enrollment confirmation communications to start 5th grade for the inaugural year of this state of Tennessee charter school, which was receiving federal funding, along with Metropolitan Nashville Public Schools (MNPS) receiving federal funding.

23. Plaintiff started an active parenting process immediately with TNA which lasted throughout the summer of 2023 to share necessary information regarding the years of parental experience on the attention deficit and hyperactive disorder (ADHD) behavioral disabilities as well as the autism spectrum disorder (ASD) behavioral disabilities, of JD, along with parental planning to develop an educational and emotional support team for JD, including coordinating two (2) independent child psychologists as private providers, one of which was available to make visits to TNA to support JD, in class and otherwise, just as this same provider arranged by Plaintiff already had done for JD at the prior K-4 school, with MNPS, as a necessary professional supplement to the IEP Team, at MNPS; however, TNA and its agents on the IEP Team rejected the parental plan to support JD on August 29, 2023 assuring and promising Plaintiff parent that the TNA program - with its own system, or team, comprising these persons - was sufficient to fully support JD.

24. Based on promises made by TNA, Plaintiff(s) sacrificed the benefit of such private supplemental support team which parent had painstakingly developed for JD including an on-site professional, which agreement or promise by TNA for exclusive TNA educational support services Plaintiff(s) relied on, to the damage or detriment of Plaintiff(s), as described throughout the following paragraphs. Plaintiff(s) was thus denied the equal protection of substantive due process, because any given IEP Team nor its individual members cannot be automatically determined or deemed to be totally sufficient support for an eligible child, such as JD. More support was required for JD, but that ball was dropped early-on within this educational process and repeatedly re-dropped throughout the process along with other affirmatively adverse acts and other misconduct committed by defendant principal TNA Founder and Executive Director, Jay Renfro (Roy "Mr. Jay" Renfro), with impunity, that is, with zero accountability by any state sources of regulation, support, nor investigation, along with defendant Renfro actually actively being affirmatively assisted and protected by state actors (also named as defendants herein) under color of law, despite such misconduct by defendant Renfro.

25. Plaintiff sought to participate as a parent by visiting the homeroom class of JD on the morning of August 29, 2023 with non-allergen cupcakes for the kids, and Plaintiff discussed leadership and teamwork topics as invited by the homeroom teacher (defendant) A. Herrera: JD was calmly engaged and upbeat in the class. The first IEP

5

**COMPLAINT**
**D.D. ex rel. J.D.D. v. Tennessee Nature Academy**
Case 3:25-cv-00530   Document 1   Filed 05/08/25   Page 5 of 57 PageID #: 5

meeting at TNA was held during the afternoon of the same day with defendant principal Renfro both present and presiding which resulted in JD being <u>denied an ADHD coach-and-tutor</u> (8/29/23) by TNA, as was specifically requested from TNA by Plaintiff parent based on years of educational experience, along with IEE support from private professionals. Plaintiff also participated in TNA events for "Founding Families" such as the inaugural quarterly meeting for TNA parents on <u>Tuesday, October 3, 2023</u> but Plaintiff(s) soon disappointingly discovered the emerging truth about Tennessee Nature Academy and its demographics, such as TNA having much fewer black students than what JD had experienced and enjoyed at MNPS as an African American student. TNA had been denied a public charter by the MNPS School Board on the city level in 2022 - not only once (April 26, 2022), but twice (July 25, 2022), before being narrowly approved by a TPCSC public educational commission vote (with the commission chairman voting NO) on the state level later that year (October 18, 2022), with the strongest objections coming from the TPCSC Executive Director defendant Stovall due to the weak financials of TNA, including the TNA financial planning to pay lower salaries to special education professionals such as defendant Johnson while seeking dually certified teachers. These developmental documents submitted by TNA leadership defendants Renfro and Savage to these city and state public educational tribunals in 2021-22 also made multiple references to seeking to serve the diverse demographics of southeast Nashville, Antioch and Cane Ridge, Davidson County, Tennessee, to get approved for federal funding; however, much of the initial support for TNA came from "*prospective* students and parents" living in *rural areas* in Tennessee *outside of these diverse areas*. Plaintiff(s) submitted a concern in writing on October 5, 2023 to TNA leadership Renfro and Savage, which just happened to be just a couple of days *before the overseas occurrences of* **October 7**:

**As I was walking into <u>Tuesday</u>'s inaugural quarterly meeting for TNA parents, I overheard a black girl calling out a racist comment from a white boy. She said, "That's racist".**

**On yesterday the next day, JD was encouraged to copy racist and anti-Semitic imagery based on pictures that were shown to him by another student. It is our understanding that this student said his parents approved the images.**

**This convergence of disturbing events along with the general rise of racism and antisemitism throughout society demands your action, such as a TNA student and parent sensitivity meeting alerting that this prejudice is zero tolerance at TNA.**

**African American students are a minority within TNA and demand active protections for their educational development and psychological well-being amid historical events and the current climate.**

**Please let us know what you need to proceed.**
END OF EMAIL

**COMPLAINT**
**D.D. ex rel. J.D.D. v. Tennessee Nature Academy**

26. Despite this demand for action such as a much-needed zero-tolerance training meeting regarding both racism and antisemitism, TNA (a) completely failed with deliberate disregard to address a hostile educational environment having severe and pervasive elements of conduct and adversity as detected and determined by early October 2023, and TNA (b) actually never responded to Plaintiff(s) with deliberate disregard, *despite the overseas occurrences of* **October 7** having created a heightened global awareness of the important issues having been previously raised by Plaintiff(s) within the above-quoted October 5 complaint to TNA. Additionally, Plaintiff sought to participate as a parent by submitting a proposal to TNA on March 26 and April 8, 2024 for commercial software on the topic of improved daily communications between parents and school, which top topic of school concerns defendant principal Renfro admitted during a PTO meeting had been neglected all-year, by TNA; however, Plaintiff never heard back about such *ClassDojo*.com proposal. Plaintiff(s) was thus denied the equal protection of parental participation more than once. Plaintiff(s) was denied both procedural and substantive due process to correct wrongs and plan programs regarding matters concerning all parents and students, including JD.

27. TNA soon exposed its hostile educational environment based on race, sex, disability, and color, for JD, which was severe or pervasive, so much so that Plaintiff parent began to get communications from defendants about the disability childhood behaviors of JD which resulted in a series of unjustified suspensions by TNA from the general educational environment for the exact same types of disability childhood behaviors that Plaintiff had spent all summer 2023 preparing TNA for - by Plaintiff proposing a private support team based on Plaintiff's years of parental experience regarding JD, regarding these disability childhood behaviors - which parental educational and emotional support team of experts TNA nevertheless refused. TNA and its personnel therefore had an enhanced and elevated contract law or common law duty and other duties to JD, and to Plaintiff, who had been denied the equal protection of substantive due process, as a parent, jointly and coincidedly with a federally covered child; however, TNA began to engage in unjustified separations of JD from other students within designated areas and unjustified suspensions of JD to summarily separate him from general education and otherwise deny to him a free appropriate public education (FAPE). During the first unjustified suspension from general education at TNA, with JD being suspended-at-home for the day, on September 19, 2023, JD independently did his own morning school work and also painstakingly drew his own Mexican flag artwork to celebrate **Hispanic Heritage Month (September 15 to October 15, 2023)** for the delight of his homeroom teacher A. Herrera, whom JD cordially communicated with via video messaging. This pupil positivity of JD was in very stark contrast to the poor pictures beginning to be painted about JD, by defendant principal Renfro. Plaintiff inventoried the child's backpack on the same suspension day (9/19/2023), and located several points-and-incentives sheets of perfect-behavior days by JD, which sheets defendant Renfro admitted to being aware of: JD nevertheless was suspended but not others, for a day or days at a time, for some sort of series of boys sports shoving matches at recess on September 18, October 24, and November 6, 2023. Afterwards, defendant Renfro acting in bad faith developed his own points-and-

7

**COMPLAINT**
**D.D. ex rel. J.D.D. v. Tennessee Nature Academy**
Case 3:25-cv-00530    Document 1    Filed 05/08/25    Page 7 of 57 PageID #: 7

incentives sheet themed on the international interests of JD which contained several steps of supposed "world traveler" progression from "couch potato", to "state traveler", to "national traveler", and on to several superfluous other steps, before supposedly reaching the child's well-known desired status of "world traveler", which status JD never did reach on the sheet per defendant principal Renfro's personal opinion - despite the child's *efforts* and with said defendant knowing full-well the child's *dream* to really be a "world traveler" some day - because defendant Renfro would get a cruel and silly "kick" out of randomly busting JD back to a "couch potato" on his own points-and-incentives sheets for JD (which was a different set of stapled sheets from the 2-sided points sheet developed by the IEP Team at TNA), for any small sleight or slip by JD. On that note, defendant Renfro engaged in other intentionally cruel and silly antics of animus jointly and coincidedly against Plaintiff parent and his son JD, such as on a TNA field trip of three chartered buses of kids and adults from Nashville, Tennessee to Makanda, Illinois for a clearer regional view of **The Great North American Eclipse** on April 8, 2024 which included a school groups trek through the woods of **Giant City State Park** (Makanda, IL), with defendant Renfro deliberately separating his lead of the main group from, and leaving both Plaintiff parent and his son JD, to walk a longer and lonelier trail through the Shawnee Hills woods alone by themselves for a long period of time eventually to arrive at the camp site to view the total solar eclipse, at about 2:00 pm CST, with the combined school groups encampment in Cobden, IL; thereby, defendant Renfro also denying JD the opportunity to *officially* **win** a school contest (because defendant principal Renfro had been very vocal to everyone about his not wanting JD to be able to go on the field trip in the first place), for "**which child walked the longest trail route on eclipse day**" - which *actual* **winner** was **JD**, accompanied by Plaintiff parent (that is, intentionally cruel and silly antics of animus, by defendant principal Renfro of TNA). Defendant principal Renfro, as an administrative agent of TNA, clearly prioritized his own and its own policy pattern of excluding and *suspending JD*, over *supporting JD*, despite the IDEA and other supports requested by Plaintiff, for JD, from the very beginnings of TNA operations.

28. Plaintiff(s) attempted to reach-out by the end of October 2023 by again asking IEP Team and defendant Johnson as the special education agent of Tennessee Nature Academy for an ADHD Coach, for JD, because the IEP Team of TNA had denied JD a **one-on-one professional ADHD coach-and-tutor** at the inaugural IEP meeting at TNA on August 29, 2023; however, defendant Johnson failed to respond to the October 31, 2023 email of Plaintiff. The IEP "team" promised by defendant Renfro at the top of TNA, Year 1 (in lieu of Plaintiff's support team of experts from summer 2023), that is, defendant Johnson, simply stopped communicating with Plaintiff parent, and JD's grades began to trend downward.

29. The emerging awareness of the existence of the hostile educational environment of Tennessee Nature Academy was heightened, beginning the very next month in November 2023, with an extra element of conversational sex topics, including hand-drawn genitalia exhibits being delivered to impressionable youths by defendant principal Renfro (TCA 49-6-1304(b)(2)), teaching unlawful sex education ("5th grade personal hygiene") to his

8

**COMPLAINT**
**D.D. ex rel. J.D.D. v. Tennessee Nature Academy**
Case 3:25-cv-00530     Document 1     Filed 05/08/25     Page 8 of 57 PageID #: 8

own separated cohorts of girls and boys, but particularly to boys, such as defendant principal Renfro teaching the actual dynamics of sexual intercourse, and also encouraging kids to come to him with any questions about sex, which misconduct by an authority figure continued throughout the year.

30. This heightened hostile educational environment was additionally elevated, with gaslighting social bullying, by other kids engaging in a pervasive pattern as classmates of JD to generally (a) target JD with these sex topics - which had been unlawfully educated and encouraged by defendant principal Renfro throughout the inaugural year of TNA - as one of multiple (b) tools by these classmate minors and defendant principal Renfro to specifically (c) target JD with unjustified discipline, by engaging in collective, corporate conduct to deliberately trigger the ADHD/ASD childhood disability behaviors of JD, and ultimately also (d) target the resulting responses and reactions of JD for more bullying, and discipline, including defendant Renfro and other agents of TNA to then consistently (e) contact Plaintiff parent (at work) for the resulting wrong reasons about the supposedly chronic disciplinary problems of JD, thereby extending the hostile environment disability discrimination from the ADHD/ASD disability student jointly and coincidedly to the parent of the ADHD/ASD disability student, by a federally funded educational program and institution.

31. The primary *modus operandi* for this pervasive pattern of conduct based on classmates' perception of or animus toward the behavioral disability of JD was for a classmate to approach JD to (a) trigger intentionally his behavioral disability, or other response or reaction, which is then deliberately misconstrued by adults on-site at the institution with intent or animus, (b) toward facilitating a false accusation against JD, which (c) severe or pervasive conduct continued throughout the year. One of these hostile environment incidents matching this primary *bullying M.O.* was on "the nature-based class space" of TNA, that is, on *the playground*, on April 5, 2024. A kid was haphazardly twirling his jacket within the personal space of JD despite JD asking the kid to stop before JD got hit and possibly injured, which triggered JD to react *like anyone else*, resulting in other kids grabbing at JD *to defend the kid offending the personal space of JD*, and also resulting in the suspension of JD by defendant Renfro, and not the other boys who were clearly the cliquish instigators. Another one of these hostile environment incidents matching this primary *bullying M.O.* was in the cafeteria on January 24 and January 29, 2024. JD had been taunted by another kid for weeks beginning earlier in January which escalated into a physical encounter resulting in defendant principal Renfro suspending JD, for 3 days, but not the other boy, who is white. An additional one of these hostile environment incidents matching this primary *bullying M.O.* was in Art class on May 16, 2024. JD was practicing one of his twice-exceptional hobbies of writing in Amharic - which is the language of Ethiopia - when both a boy classmate and a girl classmate approached JD asking what JD was doing. When JD said he was practicing Amharic (pronounced ahm-HAR-rick), *his classmates falsely accused JD of saying, "I'm HARD"*, while not acknowledging nor accepting *what JD was actually saying : "ahm-HAR-rick"*. JD even spelled the word Amharic, but the Art teacher contacted defendant principal Renfro anyway to discipline JD, <u>not</u> the classmates, as if JD were an offender. This situation and

9

**COMPLAINT**
**D.D. ex rel. J.D.D. v. Tennessee Nature Academy**
Case 3:25-cv-00530    Document 1    Filed 05/08/25    Page 9 of 57 PageID #: 9

the other separate situations described above constituted a representative example of a classmate - or in this example, a boy and a girl classmate (from the boy and the girl sex education cohorts conducted by the principal) - approaching JD to (a) trigger his behavioral disability, or other response, which is then deliberately misconstrued by an adult, particularly defendant Renfro, (b) toward facilitating a false accusation against JD, which is exactly what happened here, with JD having quietly engaged in a twice-exceptional study of another language in a classroom setting but then was falsely accused by meddlesome classmates, resulting in a teacher being summoned, leading to defendant principal Renfro quickly coming to the Art class to tag and target JD for discriminatory adverse action with a pretext of discipline, when JD simply only had been minding his own business practicing Amharic, which is an African language. This was the primary form of gaslighting social bullying as well as sex discrimination or *sexual harassment against JD* at TNA constituting a singularly hostile educational environment, for JD, based on his disability and sex, and other protected classes, including race.

32. The secondary *modus operandi* for this pervasive pattern of conduct based on classmates' perception of or animus toward the behavioral disability of JD was for a classmate to approach JD to (1) feign or fake a friendship, or friendly banter, with JD, to make a comment, request, or challenge, or otherwise engage in a silly subterfuge of intentional triggers, for the sole purpose of making some sort of behavioral spectacle out of JD, (2) leading JD to think he's (a) actually making friends with him intending cordial and comical camaraderie, and/or, (b) making conversations and connections with classmates and teachers based on topical matters that had been *brought to his attention* by any given nefarious, negative, or needling classmate making the initial approach to JD, and with (3) teachers and defendant principal Renfro consistently (a) facilitating the gaslighting by invariably overreacting to whatever childhood behavior by JD was so requested or challenged, or so triggered, by the instigating classmate, and then (b) these adult teachers contacting Plaintiff parent to once again superfluously *"have a talk"* yet again about how much JD is supposedly constantly misbehaving - which in turn is discrimination towards Plaintiff parent for having a disabled child within a federally funded program. This pervasive pattern persisted throughout the inaugural school year (2023-24) of TNA. Another one of these hostile environment incidents matching this secondary *bullying M.O.* was on a field trip to **Cheekwood Estate and Gardens** in Nashville, on June 6, 2024. TNA students on the field trip walking along The Carell Trail encountered the ***Crawling Lady Hare* (1997)** artwork statue made of steel wiring by British sculptor **Sophie Ryder (b. 1963)** depicting a feminine humanoid hare crawling on all-fours (https://cheekwood.org/discover/sculpture-trail/sophie-ryder/), which same British artist has deployed a plethora of other similarly seemingly-creepy bunny sculptures all over the world (https://sophieryder.com). As part of a group of kids on a field trip, another student said something about whatever was seen by this impressionable youth group as the seemingly-sensual nature of this wooded-area sculpture at Cheekwood which of course led other young minds to have an opinion about the artwork as well, along with leading a teacher or two (who were also IEP Team members, including defendant Johnson and also J. Otero) to also have a curious, comical, or coital comment about how creepy, inappropriate, or disturbing the sculpted bunny was, and is.

10

**COMPLAINT**
**D.D. ex rel. J.D.D. v. Tennessee Nature Academy**
Case 3:25-cv-00530    Document 1    Filed 05/08/25    Page 10 of 57 PageID #: 10

Homeroom teacher defendant Herrera was the adult on the Cheekwood field trip assigned to the group of kids that JD was also assigned to (which homeroom teacher of JD already had turned-on JD *despite what JD had done for Herrera on September 19, 2023 as described above* and participated along with defendant principal Renfro in unlawfully gathering false evidence against JD, on May 9, 2024, as described below), who proceeded to single-out JD for his child commentary about the artwork by falsely accusing him of inappropriately talking about sex, whereas JD had comments, along with the other kids and adults present also having comments about the British sculpture; nevertheless, the same teacher contacted the Plaintiff parent (at work) about JD allegedly talking about a "Sex Rabbit", as if JD were somehow being an unruly and uncontrollable behavioral problem, even on a delightful grade-school, field-trip day to Cheekwood. Additionally, defendant Herrera somehow decided to advocate for defendant Renfro's sex education during her contacts to Plaintiff parent from Cheekwood grounds. This situation constituted a representative example of JD thinking he was part of a (a) friendly group making a conversation about a topic, which originated from (b) someone else, as the instigator classmate, for JD to also elaborate on the topic aiming to be part of the interaction or conversation, (c) yet JD being targeted for discipline, based on an over-reaction, over-responding, or over-correction by adult agents of TNA to his childhood chatter-boxing, which another child classmate had triggered, specifically targeted and intended *to get JD in trouble*, as gaslighting bullying, based on his known or perceived behavioral disabilities, and, (d) which whatever reactive behaviors of JD are being disciplined - such as such *childhood chatter-boxing* - are themselves *being impacted, influenced, or impaired by his ADHD/ASD*, along with (e) the teacher contacting parent to complain about supposed misbehaviors *related to ADHD/ASD*, which chronic contacts with Plaintiff parent (at work) initiated for the wrong reasons constitute discrimination towards the parent of a disabled child for having a disabled child enrolled within a federally funded program and institution. This was the secondary form of gaslighting social bullying as well as sex discrimination or *sexual harassment against JD* at TNA constituting a dually or doubly hostile educational environment, for JD, based on his disability and sex, and other protected classes.

33. **The above-described multi-layered as well as heightened hostile educational environment was ultimately elevated to a capstone crescendo of misconduct against JD, because the tertiary *modus operandi* for this pervasive pattern of the above-stated serial conduct based on classmates' perception of or animus toward the behavioral disability of JD - thereby constituting a distinctive collective, corporate pattern of intentional, institutionalized misconduct against JD, which pattern is imputable to defendant Renfro *inter alia* by way of his unlawful sex education, as an agent of TNA - was patently false accusations of "sexual harassment" against JD.**

i.  Plaintiff African American Dad dropped his son JD off at school on what appeared to be any given normal school day, but by the end of that same day on <u>May 9, 2024</u>, he had been brazenly personally expelled by defendant white principal Renfro on a false charge of sexual harassment against a fellow 5th grader in his class, who is a girl of east Indian descent of comparatively lighter-complexion, that is, color (TC), who falsely claimed that

COMPLAINT
D.D. ex rel. J.D.D. v. Tennessee Nature Academy
Case 3:25-cv-00530    Document 1    Filed 05/08/25    Page 11 of 57 PageID #: 11

JD jumped on her back in PE class that day and made a sexual noise. JD was actually standing in a line behind the girl TC, waiting for the PE teacher "Coach Q (Q. Hudson), who is an African American male along with JD, to sign his points-and-incentives sheet that he needed related to his IEP-*by-TNA* to be able to go on to his next class, when the girl TC backed and bumped *into him* and *she made a noise*, that is, a scream.

ii.  Defendant Renfro contacted the father of TC but did <u>not</u> contact Plaintiff parent: the father of JD (which is an equal protection violation, in and of itself). **At that point**, *the father of TC supposedly made defendant Renfro aware by phone of other allegations between JD and TC that supposedly made TC feel "uncomfortable".* **(The rhetorical question here, at this juncture, is: Why hadn't the father of TC contacted the school before *being prompted by* the discriminatory conduct of defendant school principal Renfro of contacting TC's dad but not JD's dad about alleged "sexual harassment" on May 9, 2024? The rhetorical answer is: A boy merely having a "crush" on a girl is not "sexual harassment".)** In his email to defendant TPCSC the next day (5/10/2024), defendant Renfro claimed that he then received a text from the father of TC indicating that he was "not comfortable" with his daughter "being *at school* with" JD. This was a deliberately and patently false statement by defendant Renfro to a public educational tribunal displaying his malicious intent towards JD, because what the father of TC actually said in his 5/9/2024 *text message* (which was <u>not</u> a complaint on "sexual harassment" required by the **2020 Title IX Rule**) to defendant Renfro was that he was "not very comfortable leaving them both in the *same class*". Defendant principal Renfro received absolutely no information, indication, nor instruction from the 5/9/2024 text message from TC's father that he was actually coordinating or even contemplating any <u>formal complaint for sexual harassment</u> with TNA, as would *be required* from him by the **2020 Title IX Rule** (34 CFR 106.30). Defendant Renfro therefore consciously used the <u>May 9, 2024</u> incident in PE class (which in and of itself was part and parcel of a continuing pattern of harassment and bullying *against JD*) as a false pretext to intentionally target JD for unlawful discrimination, *by maliciously expelling*, rather than *by merely separating* these two students into <u>different classes</u> *even if this <u>alternative option</u> were even conceivably necessary (rather than a "teachable moment" for both the boy <u>and</u> the girl on handling "feelings" and "attention")*, which <u>mere SEPARATION</u> was indeed the singular and <u>actual ASK</u> by TC's father in his May 9, 2024 text message to defendant principal Renfro (with *zero input requested from JD's father*). **(If defendant Renfro had received a similarly solicited concern from a parent about a "boy crush", that is, a boy-to-boy affinity, with the same or similar content of communications from any given parent such as was received from the father of TC on 5/9/2024, defendant principal would have taken ZERO adverse action against an LGBTQ+ or a "gay" boy; however, JD simply engaging in the "straight" sexual-orientation behavior of an alleged "crush" on a girl, by contrast somehow provided defendant a strangely yet still unlawfully convenient pretext for intentional and malicious discrimination against JD, by defendant Renfro, based on sex, that is, *straight*-sexual-orientation, and other protected classes, as detailed in the following paragraphs.)**

12

**COMPLAINT**

iii.   Defendant principal Renfro immediately decided that very day to conduct his own "sexual harassment investigation" and quickly proceeded along with defendant Herrera to collect written statements from KIDS that same afternoon (5/9/2024), without any prior parental permission nor any notice to Plaintiff parent, including collecting a statement from Plaintiff's child regarding a highly-sensitive matter without prior parental consent; however, the defendant white principal pointedly did not collect any written statement from "Coach Q", who was the only adult present in the PE class, and also a black male - same as Plaintiff's son. The PE teacher (Q. Hudson) later - within an IDEA manifestation determination review (MDR) meeting that was brashly rushed by defendant principal Renfro, with defendant Renfro present and presiding (5/14/2024), just as Renfro was present and presiding over the inaugural IEP meeting at TNA, for JD (8/29/2023) - agreed with Plaintiff's son on what actually had happened in the PE class (5/9/2024): Plaintiff's son did <u>not</u> jump on the girl's back nor make a noise - but defendant principal completely disregarded the teacher "Coach Q", as a black male; again - same as Plaintiff's son JD.  By the end of that SAME DAY (5/9/2024), defendant principal had "expelled" Plaintiff's son for "sexual harassment".

iv.   Plaintiff parent immediately sent a protest email to defendant principal Renfro that same evening vehemently denying the "sexual harassment" charge against Plaintiff's son and asking for additional information from defendant principal (5/9/2024), including information about the unlawful sex education classes provided to TNA students for two semesters by the *same defendant principal as sex education teacher*, which unlawful sex content by defendant principal had created-and-elevated a hostile educational environment within the school *against Plaintiff's son resulting in sex topics being used as a bullying tool by classmates to actively discriminate against JD - based on a perception of his disability and/or of the disability's resulting behavioral reaction - as instigated gaslighting and other triggering-or-targeting acts against JD, such as (1) these false accusations of "sexual harassment" against JD, (2) then being further used as the next-level tool of pretext for further discrimination by defendant principal Renfro and other adults, such as defendant Herrera*  (5/9/2024):

**JD strongly denies these serious allegations.**

**To prepare for any manifestation or other meeting, we will need a copy of the transcript, synopsis, and curriculum of the recent sex education sessions taught by Tennessee Nature Academy, with the issue being whether these highly explicit educational sessions properly accommodated JD's disability or properly implemented his IEP.**
END OF EMAIL

v.    Defendant principal Renfro then escalated and magnified his misconduct against a disabled child by filing a *false complaint for "sexual harassment" against Plaintiff's son* the very next morning (5/10/2024) with his state-level charter school board-or-district TPCSC in retaliation against JD for asserting his rights on the evening before (5/9/24), instead of defendant Renfro simply responding to Plaintiff parent's protest email from the

13

**COMPLAINT**
**D.D. ex rel. J.D.D. v. Tennessee Nature Academy**
Case 3:25-cv-00530    Document 1    Filed 05/08/25    Page 13 of 57 PageID #: 13

prior evening (5/9/2024), which defendant Renfro did not respond to, at all, just as defendant Renfro did not respond to Plaintiff's hostile environment email from the prior fall, at all, just *before October 7* (10/5/2023). Defendant principal's Title IX complaint against Plaintiff's son with TPCSC made demonstrably false statements, but defendant Thomas cared nothing about it.

vi.   Plaintiff parent sent additional emails to defendant Renfro which included Title IX and other grievances; nevertheless, defendant Renfro continued to proceed to the IDEA manifestation meeting on May 14, 2024, unlawfully using the meeting as a Title IX expulsion hearing for "sexual harassment", without **2020 Title IX Rule** due process.

vii.  Plaintiff parent objected to defendant principal Renfro starting the manifestation determination review (MDR) meeting on May 14, 2024 as an inquisition, by reading hearsay statements from KIDS (May 9, 2024), which inquisition was directly contrary to the **2020 Title IX Rule** procedural due process protections of 34 CFR 106.45(b)(5)(v), (vi), and (vii), as his own *slanted, self-serving "proof" within an IDEA meeting that JD had engaged in Title IX sexual harassment against TC, by jumping on her back and making a sound, within the PE class (5/9/2024); **however, an adult witness who was present at both this PE class (5/9/2024) and the IDEA meeting (5/14/2024) - the PE teacher "Coach Q" - said that JD did not jump on the other student's back in PE class**.*

viii. Plaintiff parent objected to the voting procedure within the IDEA meeting because defendant Renfro continued to press for a manifestation vote against JD from his own employees (creating a conflict-of-interest, "COI"), including the PE teacher (Q. Hudson), despite the teacher already saying to his boss defendant Renfro that JD *didn't do it*.

ix.   Plaintiff parent objected because plaintiff(s) as well as other MDR attendees to the IDEA manifestation meeting, including members of the school's own outside evaluation team of contractors (S. Hunter and K. Waner), **abstained** from voting due to a clear factual challenge and conflict-of-interest (COI), but defendant Renfro nevertheless persisted to press for an IDEA manifestation vote *against JD* (1) from his employees, such as "Coach Q" (Q. Hudson) who actually supported JD on the PE class facts on 5/9/2024 that JD was standing in line for his IEP points sheet to be signed when the girl TC backed into him and screamed (COI no. 1), and (2) from his other employees (J. Johnson and J. Otero) with both voting (COI no. 2) and with defendant Johnson directly involved with providing (insufficient and inadequate) special education support for JD *since the beginning of the school year*, 2023-24 (COI no. 3), until defendant Johnson had begun at some point to try to pass his torch or burden of failure to J. Otero.

x.    Plaintiff parent sent additional protest and complaint emails to defendant TPCSC which included Title IX and other grievances; however, defendant Thomas and defendant TPCSC, which had previously chartered TNA for its inaugural 2023-24 school year, nevertheless completely supported both defendant principal Renfro's false-and-retaliatory complaint against Plaintiff's son and defendant principal Renfro's illegally buck wild decision to brazenly and instantly expel Plaintiff's son without any of the federal **2020**

14

**COMPLAINT**
**D.D. ex rel. J.D.D. v. Tennessee Nature Academy**

**Title IX Rule** due process procedures required by 34 CFR 106.45 as the applicable process that was indeed due, pursuant to the Fourteenth Amendment to the United States Constitution.

xi. Plaintiff(s) appealed to additional state actors at both school-level and state-level as listed herein below as defendants, who have provided ZERO Title IX relief to date.

xii. Plaintiff parent submitted a **2020 Title IX Rule** complaint to defendant Renfro and defendant Savage, on May 14, 2024; however, Defendants have not both commenced and completed a proper **2020 Title IX Rule** investigation, which includes exculpatory statements for equal protection from black males JD and QH, pursuant to 34 CFR 106.45(b)(5)(vi)(2020).

xiii. Plaintiff parent submitted a **2020 Title IX Rule** complaint to defendant Thomas, on May 20, 2024; however, Defendant has not both commenced and completed a proper **2020 Title IX Rule** investigation, which includes exculpatory statements for equal protection from black males JD and QH, pursuant to 34 CFR 106.45(b)(5)(vi)(2020).

xiv. Plaintiff parent submitted an **unlawful sex education complaint, pursuant to TCA 49-6-1306(a)** to defendant Stovall on August 16, 2024 and a **2020 Title IX Rule** complaint to the offices of defendant Stovall, on May 20, 2024; however, Defendant has not both commenced and completed a proper **2020 Title IX Rule** investigation, which includes exculpatory statements for equal protection from black males JD and QH, pursuant to 34 CFR 106.45(b)(5)(vi)(2020), nor has defendant *as an LEA director* done the sex education investigation required by said state statute *which requisite investigation also has relevance for the instant Section 504 disability harassment complaint and case*:

**"The director shall investigate the complaint and report such director's findings, along with any recommendations for disciplinary action, to the local board for further action. The local board shall file, in a timely manner, a report with the commissioner regarding any action or inaction taken. On an annual basis, the commissioner shall transmit those filings to the chair of the education committee of the senate and the chair of the education instruction committee of the House of Representatives." TCA 49-6-1306(a)**

xv. Plaintiff parent submitted a **2020 Title IX Rule** complaint to defendant Hersey, on July 15, 2024; however, Defendant has not both commenced and completed a proper **2020 Title IX Rule** investigation, which includes exculpatory statements for equal protection from black males JD and QH, pursuant to 34 CFR 106.45(b)(5)(vi)(2020). Defendant Hersey was obligated by law to complete a civil rights investigation, pursuant to 34 CFR 300.152(c)(1), and to complete such within 60 days, or by September 15, 2024, pursuant to 34 CFR 300.152(a). Defendant Blackard on behalf of defendant Hersey started a civil rights investigation under color of law via a state email, dated August 15, 2024, but such investigation was not completed at all, nor completed to include exculpatory statements

15

**COMPLAINT**
**D.D. ex rel. J.D.D. v. Tennessee Nature Academy**
Case 3:25-cv-00530    Document 1    Filed 05/08/25    Page 15 of 57 PageID #: 15

for equal protection from black male QH, pursuant to the **2020 Title IX Rule,** 34 CFR 106.45(b)(5)(vi)(2020).

xvi. Plaintiff parent submitted a **2020 Title IX Rule** complaint to the offices of defendant Blackard, on July 15, 2024; however, Defendant has not both commenced and completed a proper **2020 Title IX Rule** investigation, which includes exculpatory statements for equal protection from black males JD and QH, pursuant to 34 CFR 106.45(b)(5)(vi)(2020). Defendant Blackard on behalf of defendant Hersey pretended to be conducting a civil rights investigation under color of law via a state email, dated August 15, 2024, thereby gleaning information from Plaintiff(s).

xvii. Plaintiff parent submitted a **2020 Title IX Rule** complaint to defendant Jones, on July 17, 2024; however, Defendant has not both commenced and completed a proper **2020 Title IX Rule** investigation, which includes exculpatory statements for equal protection from black males JD and QH, pursuant to 34 CFR 106.45(b)(5)(vi)(2020).

xviii. Plaintiff parent submitted a **2020 Title IX Rule** complaint to defendant Campbell, on July 23, 2024; however, Defendant has not both commenced and completed a proper **2020 Title IX Rule** investigation, which includes exculpatory statements for equal protection from black males JD and QH, pursuant to 34 CFR 106.45(b)(5)(vi)(2020).

xix. Plaintiff parent submitted a federal special education **IDEA complaint, pursuant to state statute TCA 49-10-604** to defendant Jenkins, on August 15, 2024; however, Defendant has not both commenced and completed a proper federal **2020 Title IX Rule** investigation necessary to complete said federal **IDEA investigation**, which includes exculpatory statements for equal protection from black males JD and QH, pursuant to 34 CFR 106.45(b)(5)(vi)(2020), and which relates to a special education MDR meeting having been unlawfully combined with a **2020 Title IX Rule** matter, by defendant Renfro, on May 14, 2024.

xx. Plaintiff parent submitted a **2020 Title IX Rule** complaint to defendant Ballard, on July 23, 2024; however, Defendant has not both commenced and completed a proper **2020 Title IX Rule** investigation, which includes exculpatory statements for equal protection from black males JD and QH, pursuant to 34 CFR 106.45(b)(5)(vi)(2020).

xxi. Plaintiff parent along with a qualified disabled student were discriminated against jointly and coincidedly, as a black male father (B/M) advocating for the Education of a black male son (B/M), by each of these defendants (all of whom are not black males), based on (1) gender, (2) disability, (3) color, (4) race, and/or (4) nationality.

34. **These immediately above sub-paragraphs provide the tertiary form of gaslighting social bullying as well as sex discrimination or *sexual harassment against JD* at TNA - executed by the perversely reverse discrimination of a instigating clique of young girls clearly perceiving an easy social target and falsely accusing a disabled boy of "sexual harassment", on May 9, 2024 - constituting a triply hostile educational**

16

**COMPLAINT**
**D.D. ex rel. J.D.D. v. Tennessee Nature Academy**
Case 3:25-cv-00530    Document 1    Filed 05/08/25    Page 16 of 57 PageID #: 16

environment, for JD, based on his disability, sex, and color, and other protected classes, with the full support of Tennessee Nature Academy and its leadership as well as its agents, along with and affirmed by the committees and the directors of Tennessee Nature Academy, with the full support of the state of Tennessee, via its state actors, acting under color of law, as described separately and individually within their respective causes of action in the following paragraphs.

35. **It has been a solid year and absolutely none of these state officials have commenced and completed any civil rights investigation in compliance with the federal <u>2020 Title IX Rule</u> regarding the events at Tennessee Nature Academy, on May 9, 2024. This is totally unacceptable; therefore, it is imperative that this court immediately appoint a Special Master to conduct all applicable federal investigations similar to a Special Counsel and report back to this court for further appropriate action, including referrals to appropriate state and federal law enforcement agencies.**

The Law *on the* Case

## FOR THE FIRST CAUSE OF ACTION

Fourteenth Amendment to the United States Constitution
First Amendment to the United States Constitution
42 USC 1983
42 USC 1985

36. Defendant Renfro (W/M) violated the due process and equal protection rights of Plaintiff(s), because the (1) concern expressed by the father of TC to defendant on May 9, 2024 was <u>not</u> a formal complaint on sexual harassment which was required, pursuant to 34 CFR 106.45(a)(2), and the (2) decision of defendant <u>not</u> to concomitantly contact the father of JD to confirm any actual any formal complaint on sexual harassment by the father of TC for the purpose of Title IX due process, provided an unlawful and convenient pretext for defendant as a state actor to deliberately proceed to target JD and to otherwise violate the civil rights of Plaintiff(s), pursuant to the Fourteenth Amendment to the United States Constitution.

37. **Defendant principal Renfro is sued in his official and individual capacities for compensatory and exemplary damages, for joint and several liability for the $731,943 cost of compensatory or other education for JD as reasonably calculated herein below, as a sample benchmark, including other applicable damages, plus joint and several liability for treble damages of $2,195,829, plus prospective equitable and injunctive relief, for all matters hereinabove and hereafter, which are too numerous to restate.** Meanwhile, Defendant Renfro as a white charter school

17

**COMPLAINT**
**D.D. ex rel. J.D.D. v. Tennessee Nature Academy**
Case 3:25-cv-00530    Document 1    Filed 05/08/25    Page 17 of 57 PageID #: 17

principal has been held not genuinely accountable by any other Defendant for anything, at all, despite multi-institutional processes, of injustice, from the school and its educators and directors to its state regulatory agencies and their bureaucrats. All too often, some of those bureaucrats who serve as these black female (B/F) minority career professionals for these majority institutions somehow become principally ensnared, practically entangled, or otherwise professionally ensconced within these system-serving educational, economic, and employment systems, **which are all too often are affirmatively detrimental and damaging to black boys enrolled in public schools and public charter schools**, thereby providing a uniquely convenient-and-clever minority cover of conflicted-and-unprincipled protection for many of these unjust institutions - *without some (not all) of these individuals being willing to do anything at all on their part well-within their employment duties as system-selected* **bureaucratic black women state actors** *to even try to hold powerful institutions of the majority accountable whatsoever at all, and along with a material measure of their own self-serving career-complicity with these Title VI and Title IX race-and-gender disparity dynamics which are adverse to black persons (Title VI) who are also males (Title IX).* This case is one of these insidiously common situations of such **color-coded colorism and code-switching** *complicity (that is, no federal* <u>*2020 Title IX Rule*</u> *investigation to glean exculpatory information from black males, by women state actors,* **vis-a-vis** *a highly biased "state investigation" on state letterhead dated 7/1/24, executed by a supervisory black female state actor defendant Thomas)***,** *along with duplicity (that is, women state actors pretending to do a "civil rights investigation", but not really doing their job toward securing any exculpatory information for a 5th grader black boy who was falsely accused by a non-black female potentially engaging in her own colorism, vis-a-vis a deceptive state investigative email dated 8/14/24, executed also by a separate supervisory black female state actor defendant Hersey, via defendant Blackard)***,** which biased bureaucratic behaviors committed by some (not all) black females with these government jobs (along with the some <u>not</u> actually doing their jobs) are adverse to many black males and which all too often go undetectedly under-the-radar, or deliberately unaddressed, and therefore ultimately unconstitutionally uncorrected state-action behaviors, with huge multi-generational implications and huge long-term injuries to black fathers, black families, and entire communities of color, which state-action behaviors are therefore Section 1983 violations and also ultimately Section 1985 violations. This situation is detrimental and damaging to black boys in public schools and ultimately to black men, particularly to the Dads of these boys who care for their Education. Despite such demonstrable injustice by state-actor adults, the only person who has been made to make any personal adjustment or sacrifice or any other change-of-position whatsoever in this matter - is <u>a child</u> (and his Dad actively caring and advocating for his Education), who has been physically shifted, from one broken-promising public charter school with a catchy "nature" name or moniker merely for its own "green" marketing purposes, only to transfer to another public school (MNPS), under a cloud of unjust and unfounded suspicion of <u>a black child</u> created by a white charter school principal with a puppet-master personality, who consciously coordinated this complex injustice amid a diverse range of multiple Defendant state actors - who should have known and done better - across multiple state institutions, which are federally funded; but of course, nobody in

18

**COMPLAINT**

administrative authority really cares enough to really do anything about this clear injustice, particularly because the injustice is conveniently directed toward one of society's seemingly "easy targets", a black boy, *with ADHD/ASD* (and a black Dad actively caring and advocating for his Education), based unlawfully on a *targeting* of the child's (1) gender, (2) disability, (3) color, (4) nationality, and (5) race. This governmental or institutional injustice is totally unacceptable; therefore, the purpose of the above-paragraph is to reasonably defeat any legal presumption or charitable assumption that the *black* female defendants in this case as state government actors somehow automatically have any affinity with or respect for the constitutional and other federal rights or other best interests of a black child as any professional priority on their part vis-a-vis whatever their own professional interests or other self-centered or self-serving personal best interests, other than actually doing their jobs, which are government jobs with government responsibilities.

38. **Both defendant Thomas (B/F) and defendant Hersey (B/F) are state supervisors in charge of civil rights investigations and enforcement for their respective state departments which both regulate Tennessee Nature Academy (TNA), and both black females failed to commence and complete a proper 2020 Title IX Rule investigation regarding a black boy falsely accused of *"sexual harassment" in the 5th grade*, by a non-black girl of east Indian descent and of lighter skin-complexion than the African American child, who was then expelled from TNA, by a white principal on the SAME DAY (5/9/2024) of the false accusation by a clique of young girls (one of whom was a 5th grade black female), who then submitted a false *"Title IX complaint" against the boy* dated 5/10/2024 immediately after the boy asserted his rights on the evening of 5/9/24 (which white principal's patently false complaint was not based on any formal complaint from the father of the girl who as the girl's parent only wanted the kids separated in different classrooms, at TNA), which false complaint by the principal against a black child was *singularly investigated and totally supported without even talking to the black child* by black female defendant Thomas by her letter on state letterhead dated 7/1/2024, and which principal now has received zero enforcement action from these respective state departments.**

39. Defendant Thomas (B/F) violated equal protection by not only (1) intentionally excluding JD from her investigation on behalf of defendant Tennessee Public Charter School Commission (TPCSC) - which investigation itself was based on the *retaliatory and baseless "Title IX complaint" against a child*, which defendant Renfro sent on 5/10/2024, only after Plaintiff parent asserted JD's rights on the prior evening of 5/9/2024 - but also by (2) choosing to interview on behalf of TPCSC only the harassers, gaslighters, and tormentors of JD at TNA, based on his disability, along with defendant Thomas also (3) never seeking to interview JD, (4) resulting in defendant Thomas both (a) making her own findings based on a "preponderance of evidence" in first-person, that is, "I find" (*not* "on behalf of the Commission") and (b) without *holding any hearing* for JD to be heard, thereby also (c) violating procedural due process, on the state of Tennessee letterhead of TPCSC dated July 1, 2024, all of which is the epitome of personal conduct under color of law, as follows: "*According to the initial complaint submitted by*

19

COMPLAINT

*TNA, JD has interacted with TC prior to the May 9, 2024 incident in a manner that hinders TC's access to the educational program. TC's parent indicated that JD "has been making her [TC] uncomfortable at school by staring at her, confessing his love for her, and getting in her personal space." While not all interactions rise to a disciplinary level, this conduct, as well as the behavior on May 9, 2024, was unwelcome by TC, who reported to both staff members at TNA and her parents. Other students and staff members at TNA reported corroborating statements of the May 9, 2024 incident, and therefore, <u>I find that</u> the preponderance of the evidence supports a finding of sexual harassment such that it disrupted the educational opportunity for students at TNA. Additionally, <u>I find that</u> Tennessee Nature Academy took all necessary steps with regards to the May 9, 2024 incident as it relates to supportive measures for the named students."*

END OF PERSONAL FINDINGS OF DEFENDANT THOMAS, FOR TPCSC (7/1/2024)

40. Defendant Thomas actively investigated a retaliatory state-level "Title IX complaint" with prior knowledge imparted to her in writing by Plaintiff(s) that such complaint was itself retaliation, because defendants Renfro and TNA submitted the retaliatory state complaint to defendant TPCSC on 5/10/2024 after Plaintiff(s) had asserted rights in writing on 5/9/2024; therefore, defendant Thomas proceeding with the investigation - which additionally (1) interviewed only the harassers, tormentors, and other bad actors against JD, but also failed to interview JD, and (2) decided in favor of defendant TNA, despite being devoid of and also being remiss from failing to collect any exculpatory evidence from the PE teacher (QH) regarding the false charge of "sexual harassment" - served itself to affirmatively reaffirm the misconduct and retaliation of defendants Renfro and TNA, against Plaintiff(s).

41. Defendant Thomas (B/F) has waived her qualified immunity as a state actor and is therefore sued in her personal capacity for joint and several liability for the $731,943 cost of compensatory or other education for JD as reasonably calculated herein below, as a reasonable benchmark, including other applicable damages, plus joint and several liability for treble damages of $2,195,829.

42. Defendant Johnson (W/M) violated the substantive due process rights with deliberate indifference to Plaintiff parent's request for reasonable accommodation for student by email dated October 31, 2023. Defendant Johnson along with defendant Renfro deprived Plaintiff(s) of a protected interest in liberty, property, and education by denying Plaintiff(s) a private educational and emotional support team for JD. Defendant is sued in his personal capacity for compensatory and exemplary damages.

43. Defendant Renfro (W/M) violated equal protection by contacting the father of TC, on May 9, 2024, but not contacting Plaintiff father of JD prior to statements being collected as part of an unlawful investigation.

20

**COMPLAINT**

44. Defendant Herrera (H/F) retaliated against JD for having a free speech conversation with equal protection or otherwise violated the First Amendment rights of JD within a wooded "public forum" off-site of TNA and being similarly situated to other participants in the same childhood chatter and conversations of protected speech about a work of Art, *Crawling Lady Hare* **(1997),** by a British artist **Sophie Ryder (b. 1963)** with a legitimate pedagogical concern about British Art & Culture, on a school field trip to **Cheekwood Estate & Gardens**, not inconsistent with the same or similar conversations having wrongfully occurred on-site at TNA arising from its unlawful sex education sessions; otherwise, JD would be unlawfully held to a higher behavioral standard despite the same or similar speech wrongfully encouraged and engaged in by others arising from these sex education sessions, which were taught at TNA by defendant Renfro, without any regard whatsoever for the behavioral disabilities or needs of, nor the IEP necessities of, JD, to be able to properly process the explicit content of such sessions at TNA.

## FOR THE SECOND CAUSE OF ACTION

Section 504 of the Rehabilitation Act of 1973

29 USC 794(a)
**No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.**

42 USC 12132
**Subject to the provisions of this subchapter, no qualified person with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.**
42 USC 1983

45. Plaintiff parent and student JD were qualified to participate in school activities based on said student (1) acing the 3-hour assessment testing on June 15, 2023, and (2) other acknowledgments and acceptances.

46. Defendant Tennessee Nature Academy violated Section 504, because it created, tolerated, and assisted a hostile educational environment of disability harassment against JD based on conduct which was severe or pervasive. Defendant failed to take effective and appropriate remedial action upon being notified of a hostile educational environment. Defendant failed to investigate nor even respond to Plaintiff parent at all, upon being notified in writing of a hostile educational environment early in the process of the inaugural year of TNA (10/5/2023). Defendant failed to provide student with sufficient

21

**COMPLAINT**

accommodations for his IEE-documented disabilities, such as the (1) educational and emotional support team which Plaintiff parent spent the summer of 2023 advocating TNA for, and also the (2) ADHD Coach requested by Plaintiff parent - both of which were avoided, denied, or ignored by TNA. Defendant engaged in both *deliberate indifference to* and *reckless disregard for* the civil rights of student JD regarding disability, including protecting the student from peer-to-peer harassment, along with TNA's own institutional participation in such harassment itself via its Founder and Executive Director defendant Renfro; for example, the IDEA process (MDR), on 5/14/2024, presided over by defendant principal Renfro was a key element of a hostile educational environment, because the IDEA manifestation meeting was used as a clever pretext and complex camouflage to falsely accuse JD of "sexual harassment" made possible *only by defendant Renfro magnifying, manufacturing, manipulating, and ultimately misstating* the content of a simple text message from TC's dad in order to make him say something that *actually was never said* - showing defendant Renfro's *malicious intent* and *reckless disregard* - which mendacious misconduct by defendant Renfro has <u>not</u> been investigated by any defendant state actor to date, pursuant to a requisite **2020 Title IX Rule** investigation.

**2020 Title IX Rule**
*(v) Provide, to a party whose participation is invited or expected, written <u>notice</u> of the date, time, location, participants, and purpose of all hearings, investigative interviews, or other meetings, with sufficient time for the party to prepare to participate;*
*(vi) Provide both parties an equal opportunity to inspect and review any evidence obtained as part of the investigation that is directly related to the allegations raised in a <u>formal complaint</u>, including the evidence upon which the recipient does not intend to rely in reaching a determination regarding responsibility and inculpatory or exculpatory evidence whether obtained from a party or other source, so that each party can meaningfully respond to the evidence prior to conclusion of the investigation. Prior to completion of the investigative report, the recipient must send to each party and the party's advisor, if any, the evidence subject to inspection and review in an electronic format or a hard copy, and the parties must have at least 10 days to submit a written response, which the investigator will consider prior to completion of the investigative report. The recipient must make all such evidence subject to the parties' inspection and review available at any hearing to give each party equal opportunity to refer to such evidence during the hearing, including for purposes of cross-examination; and*
*(vii) Create an investigative report that fairly summarizes relevant evidence and, at least 10 days prior to a hearing (if a hearing is required under this section or otherwise provided) or other time of determination regarding responsibility, send to each party and the party's advisor, if any, the investigative report in an electronic format or a hard copy, for their review and written response.*
**34 CFR 106.45(b)(5)(v),(vi), and (vii) (Title IX regulations, 2020 Amendments).**
END OF RULE

47. Defendant Renfro is therefore sued in his personal capacity for compensatory and exemplary damages, as applicable.

**COMPLAINT**
**D.D. ex rel. J.D.D. v. Tennessee Nature Academy**

48. Pursuant to Section 504 prohibiting disability discrimination, defendant Tennessee Nature Academy is monetarily liable - directly to Plaintiff parent - for either IDEA compensatory education or non-IDEA <u>compensatory damages for the private support services and full-time ADHD Coach requested for the future, that is, at another school of Plaintiff parent's choice</u>. JD enrolled at another institution - *with the added support long-advocated for and arranged by Plaintiff parent but unreasonably having been long DENIED by these obligated-to-pay-for-FAPE schools, to the DETRIMENT of the student* (to be **fully paid to Plaintiff(s) by TNA and its Section 2.3.2 and Section 9.2 of The Charter Agreement guarantors TPCSC & Tennessee Department of Education**)- is measurable <u>monetary</u> educational relief with OPTIONS which <u>compensatory</u> solution is actually <u>equitable</u> at its core, including a future parental CHOICE of either MNPS or other OPTION, ***because*** (1) the student JD was subjected to a hostile educational environment at TNA consisting not only of (a) the insensitivities described in Plaintiff's complaint email to TNA (10/5/2023), *which defendant TNA failed to address nor even felt the need to even respond to at all showing its deliberate indifference*, but also of (b) several levels of and multiple *modus operandi* of gaslighting social bullying against JD which further escalated into a false allegation of "sexual harassment", which allegation was - pending a full-and-proper **2020 Title IX Rule** investigation, *which no section 1983 defendant herein ever even saw fit to properly complete, even a solid year after May 9, 2024* - either (c) an expression of further gaslighting social bullying against JD, being falsely accused of "sexual harassment", by an instigating clique of girls gaslighting-and-targeting JD, on May 9, 2024, or, (d) a heretofore-concealed expression of the potential color animus of either the accusing girl TC who is of east Indian descent and of lighter complexion, that is, "color", or that of her father, because JD is a darker skinned black American, (2) defendant TNA through its agents, particularly defendant principal Renfro, actively contributed to the hostile educational environment, including the intentionally cruel antics of animus of defendant Renfro, and (3) defendant TNA spent much more time to discipline JD (with multiple unnecessary suspensions adding up to the 10 suspension days which defendant needed to wildly try to expel JD) than TNA ever did to even begin to address the above-described adversities against JD, including the zero time TNA spent responding to Plaintiff parent's hostile environment letter, dated 10/5/2023, *before **October 7*** raised global awareness of the same issues of racism and antisemitism which had been raised prior by Plaintiff parent, but Tennessee Nature Academy STILL took zero action to address either the complaint or the problem *after **October 7***, as the ultimate deliberate disregard and indifference.

49. A rudimentary remuneration rubric for a reasonable compensatory-education damages calculation for a disability discrimination remedy rooted in the *economic-equity* of many smaller schools such as TNA being otherwise resistant to *voluntarily agreeing* to the (high) cost of FAPE (such as the <u>one-on-one ADHD Coach</u> requested from TNA, by Plaintiff parent, in summer 2023, which FAPE-request was <u>denied</u> to Plaintiff <u>by TNA</u>) without federal court (judgment) intervention (not just *equity-injunctions*), **is $731,943**. Specifically, this $731,943 baseline ADHD-support compensation amount to cover the

**COMPLAINT**
D.D. ex rel. J.D.D. v. Tennessee Nature Academy
Case 3:25-cv-00530   Document 1   Filed 05/08/25   Page 23 of 57 PageID #: 23

projected costs for a total of 8 years (2023-2031) of special education professional services is calculated based on a reasonable market rate of $36 per hour for a dedicated (FT) student support professional(s), such as an in-school ADHD coach-and-tutor ($18-$36 per hour), but particularly also an in-school ABA therapist ($18-$36 per hour), for a special education student. This reasonable hourly rate of $36 for 1 or 2 independent educational professionals is multiplied by 40 hours per week of FTE for in-school support or related services for our special education student ($1,440), which is then multiplied by the average of 4.33 weeks per month ($6,235), for just 9 months of a typical school year - whereas the federal IDEA statute actually additionally allows also for summer support for special education students which justifiably higher compensation calculation is nevertheless not included herein. The resulting annual amount for FTE support costs for a school year ($56,117) is multiplied by 8 academic years, beginning retroactively from grade school year 5 (5th grade), when TNA was asked to provide the same or similar dedicated support (but did not so provide), until high school graduation in 2031 - whereas the federal IDEA statute actually additionally allows services until age 21, that is, until year 2033, which justifiably higher compensation calculation is nevertheless not included herein. This total 8-year amount ($448,936) of course has a future value (FV), based on the then-current interest rate as of spring 2024 (6.54%), projected to grade school year 12 (12th grade), with such interest compounding annually, and therefore totaling $731,943 (FV).

## **FOR THE THIRD CAUSE OF ACTION**

Title VI of the Civil Rights Act of 1964

42 USC 2000d
**No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.**

50. Defendants Tennessee Nature Academy and Tennessee Public Charter School discriminated against student on the basis of race because student JD and PE teacher "Coach Q" are African Americans. *And both of their respective statements corroborating each other that TC backed into JD* (instead of JD allegedly jumping on TC's back and making a sexual noise, on May 9, 2024), *were both totally ignored by both defendants TNA and TPCSC*, resulting in a major miscarriage of justice to outright expel JD from TNA.

51. Defendants Tennessee Nature Academy, Tennessee Public Charter School Commission, and Tennessee Department of Education discriminated against student JD on the basis of race and color (and national origin: *American*) by failing to both commence and conclude a **2020 Title IX Rule** sex discrimination ("sexual harassment") investigation (including exculpatory evidence collected from student's PE teacher that student did <u>not</u> engage in

COMPLAINT
D.D. ex rel. J.D.D. v. Tennessee Nature Academy
Case 3:25-cv-00530    Document 1    Filed 05/08/25    Page 24 of 57 PageID #: 24

sexual harassment), because both student and teacher are black *Americans vis-à-vis* the 5th grader girl accuser who was of east Indian descent and of lighter complexion than both student and teacher. Additionally, such **2020 Title IX Rule** investigation could have and should still explore whether the informal concern to defendant TNA from the father of the girl TC (which concern was instigated by defendant Renfro, on May 9, 2024) - being a girl of east Indian descent - was based on (1) JD being a black boy, *vis-a-vis* (2) any motivations of color animus and race preference against JD - being of African descent - based squarely on research literature on the cultural prevalence of colorism on the Indian subcontinent. *Bajwa, M.J., von Maur, I. & Stephan, A*. Colorism in the Indian subcontinent—insights through situated affectivity. *Phenom Cogn Sci* (2023). https://doi.org/10.1007/s11097-023-09901-6 ("Consistent discriminatory practices associated with dark and black skin color underpin the persistence of colorism and racism in the Indian subcontinent"). From such context of the Bajwa, von Maur, and Stephan colorism research findings, such **2020 Title IX Rule** investigation could have and should still explore also whether the girl TC *actually screaming* about her own *accidental contact* with JD - *when she realized that she had backed into JD as a darker-skinned person, despite the contact being within a PE class where kids are moving around and about* - was in and of itself color animus and race prejudice unlawfully motivating a false complaint of "sexual harassment".

52. Defendant Renfro (W/M) violated equal protection based on race, color, or national origin, by contacting the father of TC, on May 9, 2024, but not contacting Plaintiff father of JD prior to statements being collected as part of an unlawful investigation.


## FOR THE FOURTH CAUSE OF ACTION

Title IX of the Education Amendments of 1972

20 USC 1681(a)
**No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance** …

53. Defendants Tennessee Nature Academy, Tennessee Public Charter School Commission, and Tennessee Department of Education discriminated against student on the basis of gender by failing to both commence and conclude a **2020 Title IX Rule** sex discrimination investigation, including exculpatory evidence collected from student's PE teacher that student did not engage in sexual harassment, because both student and teacher are male.

54. Defendant Tennessee Nature Academy violated Title IX by combining a Title IX sex discrimination ("sexual harassment") hearing with an IDEA manifestation meeting (MDR) on 5/14/2024, which was a procedural violation by defendant of both laws to the

25

**COMPLAINT**

detriment of a student who was thus denied the respective processes which were due under either and both laws, as a result of defendant's misconduct.

55. Defendants Thomas (B/F), Hersey (B/F), and Blackard (H/F) following the same hide-the-ball discrimination play book as defendant Renfro (who had unlawfully combined Title IX and IDEA, on May 14, 2024, thereby obscuring and impeding a proper **2020 Title IX Rule** investigation) similarly violated Title IX by combining (their somehow deciding to drop the ball of justice, by inexplicably dropping …) a civil rights investigation with the conclusion of Plaintiff(s) "due process" IDEA procedure hearing proceedings, on August 21, 2024, before a hearing scheduled before an ALJ on other issues, on August 28, 2024, with a confidential "due process" mediation meeting and agreement (which defendants Hersey and Blackard were not present within, nor rightfully privy to, with any notice discussed and disclosed) made under a measure of duress so that JD could move on, back to MNPS, and to start a new IEP process (which IEP was being deliberately delayed by MNPS, to the dual-institutional detriment of JD, pending the ALJ "due process") - all of which was a procedural violation by defendants of both laws to the detriment of a student who was thus denied the respective processes which were due under either and both laws, as a result of defendants' misconduct.

56. Defendant Hersey (B/F) and defendant Blackard (H/F) openly displayed malicious intent to engage in deliberate indifference and reckless disregard towards the rights of Plaintiff(s), because these defendants jointly decided to play games with Plaintiff(s) in terms of when the 60 day period began (other the correct date of July 15, 2024) thereby deciding to maliciously toy with Plaintiff(s) in terms of when their "civil rights investigation" would be completed before these defendants maliciously and recklessly faked a "civil rights investigation" by asking Plaintiff(s) probing questions in August 2024 for some improper purpose to test what was actually known by Plaintiff(s), before deciding not to do any civil rights investigation at all, thereby flaunting their personal power under color of law and flouting their government-job responsibility for federally mandated rights and official governmental duties. To the extent that these biased bad attitudes of policy personality toward a taxpayer coarsely committed by these individuals under color of law using state of Tennessee letterhead are outside of the official duties of these defendants as defined by federal civil rights law, these defendants are deservedly sued in their personal capacities, for compensatory, exemplary, and punitive damages, jointly and severally with other similarly-situated defendants (such as defendant Renfro who also engaged in similarity intentionally cruel antics of animus), including but not limited to the calculated costs of Plaintiff(s)'s support services with or without IDEA, being used herein merely as a practical benchmark of measurable damages, without waiving any other and all applicable damages.

57. Pursuant to 42 USC 1983, defendant Savage (W/F) as Title IX coordinator for defendant TNA affirmatively failed to conduct a Title IX investigation. Defendant Savage is sued in her official capacity for prospective equitable and injunctive relief to be ordered by this Court to conduct a full-and-proper **2020 Title IX Rule** investigation, which includes exculpatory statements from black males.

26

**COMPLAINT**
**D.D. ex rel. J.D.D. v. Tennessee Nature Academy**

58. Defendant Savage is also sued in her personal capacity for her deliberate disregard of the rights of student JD, because defendant Savage was present within TNA facilities on May 14, 2024 but selected not to participate within the unlawfully combined IDEA manifestation meeting and faulty Title IX hearing propelled and presided over by defendant Renfro, in lieu of meeting her affirmative duty, by her simply sitting outside in the lobby during the meeting - despite defendant Savage being copied on Plaintiff parent's complaint email to defendant Renfro ("Mr. Jay") dated 5/14/2024 which was also received by defendant Savage, as Title IX coordinator, prior to the afternoon MDR meeting that day:

**Hi Mr. Jay:**

**You are clearly mixing-up federal and state procedures, because the TNA "investigation prior to the manifestation meeting" matches the grievance investigation description by Title IX.**
**https://www.law.cornell.edu/cfr/text/34/106.45**

**But you did _not_ provide Title IX notice to us that you would be interviewing a minor child and his peers:**

**Provide, to a party whose participation is invited or expected, written notice of the date, time, location, participants, and purpose of all hearings, investigative interviews, or other meetings, with sufficient time for the party to prepare to participate;**
**https://www.law.cornell.edu/cfr/text/34/106.45**

**You have also not provided 10 days' notice of neither your investigative report below nor your intention to use these investigative materials - not solely for your separate Title IX grievance - but also as indeed an "investigation prior to the manifestation meeting".**

**Create an investigative report that fairly summarizes relevant evidence and, at least 10 days prior to a hearing (if a hearing is required under this section or otherwise provided) or other time of determination regarding responsibility, send to each party and the party's advisor, if any, the investigative report in an electronic format or a hard copy, for their review and written response.**
**https://www.law.cornell.edu/cfr/text/34/106.45**

**These are merely a sample of serious procedural violations by TNA prior to a _manifestation meeting, based on a complaint of sexual harassment_, which is contrary to Title IX grievance provisions.**

**We have not waived any rights under due process of law.**
END OF EMAIL

**COMPLAINT**
**D.D. ex rel. J.D.D. v. Tennessee Nature Academy**

59. Defendant Jones (B/F) is sued in her official capacity for prospective equitable and injunctive relief to be ordered by this Court to conduct a full-and-proper **2020 Title IX Rule** investigation, which includes exculpatory statements from black males JD and QH, pursuant to 34 CFR 106.45(b)(5)(vi)(2020).

60. Defendant Campbell (W/M) is sued in his official capacity for prospective equitable and injunctive relief to be ordered by this Court to conduct a full-and-proper **2020 Title IX Rule** investigation, which includes exculpatory statements from black males JD and QH, pursuant to 34 CFR 106.45(b)(5)(vi)(2020).

61. Defendants Jones and Campbell are sued in their official capacities also for prospective, equitable and injunctive relief of reconvening their respective TNA meeting(s), held on or about July 19, 2024, to reverse the expulsion decision by defendant Renfro dated May 9, 2024 and to thus publicly and formally close the matter - as completely corrected, along with redacted and removed records - with an injunction on any further dereliction of duty by defendants to avoid enforcement of the **2020 Title IX Rule**.

62. Defendant Hersey (B/F) is sued in her official capacity for prospective equitable and injunctive relief to be ordered by this Court to conduct a full-and-proper **2020 Title IX Rule** investigation, which includes exculpatory statements from black males JD and QH, pursuant to 34 CFR 106.45(b)(5)(vi)(2020).

63. Defendant Blackard (H/F) is sued in her official capacity for prospective equitable and injunctive relief to be ordered by this Court to conduct a full-and-proper **2020 Title IX Rule** investigation, which includes exculpatory statements from black males JD and QH, pursuant to 34 CFR 106.45(b)(5)(vi)(2020).

64. Defendant Jenkins (B/F) is sued in his official capacity for prospective equitable and injunctive relief to be ordered by this Court to conduct a full-and-proper **2020 Title IX Rule** and **IDEA** investigation, which includes exculpatory statements from black males JD and QH, pursuant to 34 CFR 106.45(b)(5)(vi)(2020).

65. Defendant Ballard (W/F) is sued in her official capacity for prospective equitable and injunctive relief to be ordered by this Court to conduct a full-and-proper **2020 Title IX Rule** investigation, which includes exculpatory statements from black males JD and QH, pursuant to 34 CFR 106.45(b)(5)(vi)(2020).

**COMPLAINT**
**D.D. ex rel. J.D.D. v. Tennessee Nature Academy**

## FOR THE FIFTH CAUSE OF ACTION

Individuals with Disabilities Education Act of 1990 (IDEA)
20 USC 1400

66. Defendant Tennessee Nature Academy violated the IDEA by combining an IDEA manifestation meeting (MDR) with a Title IX sex discrimination ("sexual harassment") hearing on 5/14/2024, which was a procedural violation by defendant of both laws to the detriment of a student who was thus denied the respective processes which were due under either and both laws, as a result of defendant's misconduct.

67. Defendant Tennessee Nature Academy violated the IEP of the student by failing to accommodate or adjust the instruction of sex education ("5th grade personal hygiene") to the disabilities of JD.

68. Defendant Tennessee Nature Academy failed to modify the IEP to accommodate student despite Plaintiff parent's request for modification by email dated October 31, 2023.

69. Defendant Tennessee Nature Academy failed to modify the IEP to protect student from peer-on-peer harassment.

70. Pursuant to 42 USC 1983, defendant Jenkins (W/M) affirmatively failed to conduct a federal IDEA **state special education civil rights investigation** as was clearly required by TCA 49-10-604:

**The department of education shall promptly investigate complaints alleging violations of the IDEA and the state's special education laws in the following manner:**

- **(1) The department shall make a complaint form available on the department's website. The department shall also supply any individual with a written copy of the complaint form via the United States postal service upon request. The department shall facilitate the submission of complaint forms via the internet. If a complaint is filed via the internet, then the complaint is deemed to be signed so long as the name of the filer is indicated in the complaint. Anonymous complaints cannot be accepted for investigative purposes;**
- **(2) The department shall notify an LEA of a complaint filed against the LEA within five (5) calendar days of receiving the compliant. The notification must require the LEA to respond to the allegations contained in the complaint and to provide the department with any additional information requested by the department. The LEA must provide its response to the**

29

**COMPLAINT**

department no later than fifteen (15) calendar days from the date of the notification, unless an extension is granted by the department;

- **(3) If the department determines that the LEA has committed a violation of state or federal special education laws or rules, then the department shall issue, within ten (10) calendar days, the department's findings that confirm the violation to the LEA and the person making the complaint. The written findings must require the LEA to take all corrective action required by the department that are contained in the written findings, which may include providing compensatory education if deemed appropriate by the department;**
- **(4) The department shall require an LEA that has committed a violation of applicable law or rule to correct the violation within ten (10) calendar days, unless an extension is granted by the department;**
- **(5) Any LEA receiving notice from the department that measures are required to correct a violation of applicable law or rule shall provide written notice of the completion of the corrective measures to the department and to the person making the complaint. The department shall determine whether the measures taken by the LEA resulted in compliance with the applicable law or rule, or both. The department shall provide written notice to the LEA of the department's determination within ten (10) calendar days; and**
- **(6) Within thirty (30) calendar days after closing the investigation, the department shall publish all violations and determinations confirmed by the department on the department's official website. The publication must include the name of the LEA, a description of the violation, a citation of the law or rule determined to have been violated, the corrective measures proposed by the LEA, and the final determination of the department. The department shall publish confirmed violations and determinations in a manner that protects the identity of the student.**

*Amended by 2019 Tenn. Acts, ch. 107,s 25, eff. 4/11/2019. Acts 2007, ch. 598, § 3.*

71. Pursuant to 42 USC 1983, Defendant Jenkins (W/M) is sued in his official capacity for prospective equitable and injunctive relief to be ordered by this Court to conduct a full-and-proper TCA 49-10-604 **federal civil rights investigation for special education** for the ultimate purpose of federal IDEA corrective action by the LEA for defendant Tennessee Nature Academy (TPCSC/TNDOE), along with an injunction against any further dereliction of state statutory job duties by defendant Jenkins impacting federal rights, regarding the complaint email of Plaintiff parent to defendant Jenkins dated 8/15/2024:

**Dear Counsel:**

**Because ALJ Darnell clarified during the pre-hearing conference on yesterday that the August 28 hearing is a *de novo* review of the May 14 manifestation meeting, or basically a full re-do of the manifestation meeting itself with the ALJ deciding what**

**COMPLAINT**
**D.D. ex rel. J.D.D. v. Tennessee Nature Academy**
Case 3:25-cv-00530    Document 1    Filed 05/08/25    Page 30 of 57 PageID #: 30

is the best special education for the child student, your office should still have an affirmative investigative duty on the misconduct of the adult principal, as follows:

**VI. Whether the IDEA manifestation meeting held and presided over by TNA founder, principal, and executive director Mr. Roy "Jay" Renfro on 5/14/24 was in legal and ethical compliance with 34 CFR 300.530(e) towards making any appropriate disciplinary decision against JD, because,**

**A.** We objected to Mr. Renfro starting this IDEA manifestation meeting on May 14 by reading hearsay statements about gateway sexual and other topics unlawfully collected by him from minor children on May 9, contrary to the Title IX procedural protections of 34 CFR 106.45(b)(5)(v), (vi), and (vii), as his own proof within the manifestation meeting that JD had engaged in Title IX sexual harassment against TC, by jumping on her back and making a sound, within a PE class at TNA on May 9; however, an adult witness who was present at both this PE class on May 9 and the IDEA meeting on May 14 - the PE teacher, Mr. Quincy Hudson ("Coach Q") - said that JD did <u>not</u> jump on the other student's back in PE class;

**B.** We objected to the voting procedure within the IDEA meeting because Mr. Renfro continued to press for a manifestation vote from his employees (creating a conflict of interest), including the PE teacher Coach Q, despite Coach Q already saying to his boss Mr. Renfro that JD didn't do it;

**C.** We objected because we as JDs parents as well as other attendees, including members of the school's own outside evaluation team of contractors (S. Hunter and K. Waner), abstained from voting due to a clear factual challenge and conflict-of-interest (COI), but Mr. Renfro nevertheless persisted to press for an IDEA manifestation vote *against JD* (1) from his employees, such as Coach Q who actually supported JD on the PE class facts on 5/9 that JD was standing in line for his IEP points sheet to be signed when TC backed into him and screamed (COI #1), and (2) from his other employees (Joshua Johnson and Jaime Otero) both voting (COI #2) and directly involved with providing special education for JD (COI #3).

In other words, the ALJ will make a manifestation decision regarding the child student, not any misconduct decision regarding the adult principal.

Therefore, your office should go ahead and expeditiously proceed with a TCA 49-10-604 investigation regarding the adult principal, *such as principal-coercion and other COI during the manifestation meeting*, and still allow ALJ Darnell to decide on the child student on August 28.

Your office should conduct a special education investigation on the adult principal while ALJ Darnell decides what's the best special education for the child student.
END OF EMAIL

**COMPLAINT**
**D.D. ex rel. J.D.D. v. Tennessee Nature Academy**

## FOR THE SIXTH CAUSE OF ACTION

TCA 49-6-1304(b)(1)
TCA 49-6-1304(b)(2)
*TCA 49-6-1306(a):*
*Federal Section 504 investigation*
*for federal judicial notice of findings by statutory state investigator Stovall*


72. Defendant Renfro (W/M) violated the state statutory prohibition on teaching coital activity which must be investigated by defendant Stovall, because such required state investigation regarding unlawful sex education directly impacts the instant Section 504 hostile educational environment matter, for the purpose of this Court taking judicial notice of defendant Stovall's investigative findings.

73. Pursuant to 42 USC 1983, Defendant Stovall is therefore sued in her official capacity for prospective equitable and injunctive relief to be ordered by this Court to conduct a full-and-proper TCA 49-6-1306(a) state sex education investigation for the ultimate purpose of a federal Section 504 remedy for the sexual harassment against JD arising from the unlawful sex education at TNA, along with an injunction against any further dereliction of state statutory job duties by defendant Stovall impacting federal rights, regarding the complaint email of Plaintiff parent copied to defendant Stovall dated 8/16/2024:

    **Dear Counsel:**

    **Please be kindly reminded as the LEA for TNA of the statutory duty of your TPCSC director to investigate unlawful sex education, specifically the gateway sexual activity taught at TNA by its principal, contrary to TCA 49-6-1304(b)(1) and (b)(2), per our May 20 complaint to your office, as follows,**

    **TNA notified parents last fall that 5th graders would be receiving age-appropriate (5th grade) information about puberty and personal hygiene, specifically (1) describing the effects of puberty on hygiene practices, and (2) identifying that additional personal hygiene is needed during puberty.**

    **However, JD is saying that,**

    **"Mr. Jay said we're learning about puberty and then later we started getting deep into sex talk. We started talking about vaginas and how to insert sperm into a vagina."**

    **This actual instruction on sex is, not only shockingly in contrast to the prior personal hygiene notice provided by TNA, but also violates both state and federal law.**

**COMPLAINT**
**D.D. ex rel. J.D.D. v. Tennessee Nature Academy**

JD is also saying that Mr. Jay separated the boys into their own alternate session on sex education, not merely on personal hygiene. Parents were not notified of such separation of sexes, which facilitated Mr. Jay *targeting boys* to talk about having sex with girls.

[end of 5/20/24 email excerpt to TPCSC as parents of JD]

Therefore, please apprise us by August 21 whether such TPCSC investigation and report - based on our May 20 complaint to your offices - will be both completed and communicated by the August 28 expedited hearing so that appropriate pre-trial motions regarding this statute, as follows, may proceed:

*Notwithstanding any other law to the contrary, a parent or legal guardian of a student enrolled in family life may file a complaint with the director of schools if the parent or legal guardian believes that a teacher, instructor, or representative of an organization has not complied with the requirements of this part. The director shall investigate the complaint and report such director's findings, along with any recommendations for disciplinary action, to the local board for further action. The local board shall file, in a timely manner, a report with the commissioner regarding any action or inaction taken. On an annual basis, the commissioner shall transmit those filings to the chair of the education committee of the senate and the chair of the education committee of the house of representatives.* TCA 49-6-1306(a).

We will also need the name and address of the TPCSC investigator(s) regarding this matter, for subpoenas.

We are looking forward to your next steps.
END OF EMAIL

74. Defendant Herrera (H/F) retaliated against JD for having a free speech conversation with equal protection or otherwise violated the First Amendment rights of JD within a wooded "public forum" off-site of TNA and being similarly situated to other participants in the same childhood chatter and conversations of protected speech about a work of Art, *Crawling Lady Hare* **(1997),** by a British artist **Sophie Ryder (b. 1963)** with a legitimate pedagogical concern about British Art & Culture, on a school field trip to **Cheekwood Estate & Gardens**, not inconsistent with the same or similar conversations having wrongfully occurred on-site at TNA arising from its unlawful sex education sessions; otherwise, JD would be unlawfully held to a higher behavioral standard despite the same or similar speech wrongfully encouraged and engaged in by others arising from these sex education sessions, which were taught at TNA by defendant Renfro, without any regard whatsoever for the behavioral disabilities or needs of, nor the IEP necessities of, JD, to be able to properly process the explicit content of such sessions at TNA.

**COMPLAINT**
**D.D. ex rel. J.D.D. v. Tennessee Nature Academy**

## **FOR THE SEVENTH CAUSE OF ACTION**
### Retaliation

75. Plaintiff parent and student engaged in protected activities, including but not limited to the rights asserted within the email dated 5/9/2024, resulting in retaliation by one or more defendants.

76. All state actor defendants are sued in each person's official and individual capacities for compensatory and exemplary damages, as applicable, for joint and several liability for the $731,943 cost of compensatory or other education for JD as reasonably calculated herein above, including other applicable damages, plus joint and several liability for treble damages of $2,195,829, for each cause of action and occurrence, plus equitable, prospective, and injunctive relief, as applicable, for all matters hereinabove, which are incorporated herein.


### The Request for Relief


Damages & Justice: Plaintiff(s) is seeking equitable, injunctive, and monetary relief, and exemplary damages, and all other available relief and remedies. Each Defendant is liable in each agency's capacity as a department of the great State of Tennessee, or liable in each person's official and individual capacities, for compensatory and exemplary damages, as applicable, for joint and several liability for the $731,943 cost of compensatory or other education for JD as reasonably calculated herein above, including other applicable damages, plus joint and several liability for treble damages of $2,195,829, for each cause of action and occurrence, plus equitable, prospective, and injunctive relief, as applicable, for all matters hereinabove, which are incorporated herein.

Declaratory Judgement on Indemnity: Plaintiff(s) seeks a declaratory judgment to secure damages; specifically, a court declaration that TPCSC and TNDOE are the contractual as well as the statutory indemnitors for TNA financial obligation, pursuant to 20 USC 1412(a)(12)(B)(ii), as follows:

"If a public agency other than an educational agency fails to provide or pay for the special education and related services described in clause (i), the local educational agency (or State agency responsible for developing the child's IEP) shall provide or pay for such services to the child. Such local educational agency or State agency is authorized to claim reimbursement for the services from the public agency that failed to provide or pay for such services and such public agency shall reimburse the local educational agency or State agency pursuant to the terms of the interagency agreement or other mechanism described in subparagraph (A)(i) according to the procedures established in such agreement pursuant to subparagraph (A)(ii)." 20 USC 1412(a)(12)(B)(ii)

34

**COMPLAINT**
**D.D. ex rel. J.D.D. v. Tennessee Nature Academy**
Case 3:25-cv-00530    Document 1    Filed 05/08/25    Page 34 of 57 PageID #: 34

<u>Special Master Investigation</u>: It has been a solid year and absolutely none of these named state officials have commenced and completed any civil rights investigation in compliance with the federal <u>2020 Title IX Rule</u> regarding the events at Tennessee Nature Academy, on May 9, 2024. This is totally unacceptable; therefore, it is imperative that this court immediately appoint a Special Master to conduct all applicable federal investigations similar to a Special Counsel and report back to this court for further appropriate action, including referrals to appropriate state and federal law enforcement agencies.

<u>Request for a Jury Trial</u>

Trial by jury is requested on all issues.

**COMPLAINT**
**D.D. ex rel. J.D.D. v. Tennessee Nature Academy**

Respectfully submitted
to this Honorable Court

**D.D. ex rel. JD**
**P.O. Box 1307**
**Antioch, TN 37011**
**615-596-5460**

**COMPLAINT**
**D.D. ex rel. J.D.D. v. Tennessee Nature Academy**



**TENNESSEE**
PUBLIC CHARTER SCHOOL COMMISSION

## CHARTER AGREEMENT
### Tennessee Nature Academy

This Charter Agreement (hereinafter referred to as "this Agreement") is entered into this, the 17 day of _FEBRUARY_ 2023, by and between the Tennessee Public Charter School Commission (hereinafter referred to as "the Commission" or "the Authorizer") and Tennessee Nature Academy (the "Applicant(s)") (collectively, the "Parties") to operate Tennessee Nature Academy (hereinafter referred to as "the Charter School").

For purposes of this Agreement, "Charter School" refers to the Governing Body and the charter school. The terms "Charter School" and "Governing Body" are used interchangeably herein; however, references herein to "Charter School" shall not include other schools operated by the Governing Body.

Whereas the Commission was authorized for the service as the LEA for any public charter school it authorizes in accordance with T.C.A. § 49-13-105(a);

This Agreement consists of the following documents:

- This document and any exhibits hereto or documents incorporated herein by reference
- Approved Charter School's Application (Exhibit 1)
- Current Approved Performance Frameworks – Academic, Organizational, and Financial (Exhibit 2)
- Pre-Opening Checklist (Exhibit 3)
- Approved Waivers (Exhibit 4)

In consideration of the mutual covenants and promises contained herein and for other good and valuable consideration, the receipt of which is hereby acknowledged, the Parties hereto agree as follows:

## 1. General Terms

**1.1. Applicable Law.** This Agreement and the Charter School's operations shall be governed by and construed in accordance with the laws of the state of Tennessee and applicable federal laws. Though the Charter School may, pursuant to Tennessee Code Annotated ("T.C.A.") § 49-13-111, seek waivers from the Authorizer or the commissioner of education from Tennessee laws or rules of the State Board of Education that inhibit the Charter School's ability to meet its goals or comply with the school's mission, the Parties understand that currently, waivers may not be provided from the types of laws and rules specifically listed in T.C.A. § 49-13-111, from any provisions of Title 49, Chapter 13 (the Tennessee Public Charter Schools Act, hereinafter referred to as the "Act"), those included in the Act by reference, or from other laws specifically applicable to charter schools (such as those related to benefits or retirement of charter school employees contained in Title 8, Chapter 27, Part 3).

To the extent there is a conflict between the terms of this Agreement and the Charter School's Application, the terms of this Agreement shall govern.


By signing this Agreement, the Authorizer approves any waivers requested in the Charter School's Application, unless such waivers are excluded from Exhibit 4. Approved waivers are attached as **Exhibit 4.**

**1.2. Effective Date.** This Agreement shall be effective immediately following signature by the Charter School and the Authorizer. This Agreement shall expire on June 30 of the tenth (10th) year after the date of opening of the Charter School, unless earlier terminated or renewed pursuant to the terms of this Agreement or state law.

**1.3 Pre-Opening Process.** Upon approval by the Authorizer, the pre-opening checklist (the "Pre-Opening Checklist", incorporated into this Agreement as **Exhibit 3**), will be sent to the Charter School outlining specific actions that must be put in place during the planning year and completed prior to the Charter School opening for instruction. If the Pre-Opening Checklist is substantially incomplete at the time of inspection, the Authorizer may decide to not allow the Charter School to open until the Charter School has completed all pre-opening steps under T.C.A. § 49-13-111, Authorizer policies, and the Pre-Opening Checklist. Further, if the Authorizer may require the Charter School to delay opening for up to one (1) school year through an amendment to this charter agreement as set forth in Section 10, pursuant to T.C.A. § 49-13-108(5)(D).

If the Charter School is allowed to open under the Commission's authority despite the failure to complete all items required by the Pre-Opening Checklist, the Charter School must provide proof to the Authorizer that all items on the Pre-Opening Checklist have been completed by the date specified by the Authorizer. The failure of the Charter School to complete all items on the Pre-Opening Checklist by the specified date shall be a material violation of this Agreement and shall subject the Charter School to corrective actions, including but not limited to revocation, in accordance with the Authorizer's Intervention policy.

**1.4. Charter School Performance.** The operation of the Charter School shall be subject to the terms and conditions of this Agreement and the Act. Decisions by the Authorizer regarding amendment, renewal, or revocation of this Agreement shall be based upon applicable laws, rules, policies, this Agreement, and/or the academic, organizational, and financial Performance Frameworks (the "Performance Frameworks") incorporated into this Agreement as **Exhibit 2**, as well as the Authorizer's Intervention Policy.

The Authorizer shall have broad oversight authority over the Charter School and may take all reasonable steps necessary to oversee compliance with this Agreement and applicable laws, rules, and policies. This oversight authority includes, but is not limited to, the right to visit, examine, and inspect the Charter School and its records during the pre-opening year, during the annual monitoring visit, and to investigate a complaint (notice including a statement of the complaint shall be given to the Charter School, unless in the judgment of the Authorizer such notice would inhibit the Authorizer's ability to investigate the

Case 3:25-cv-00530    Document 1    Filed 05/08/25    Page 38 of 57 PageID #: 38


complaint. Information that may identify the complainant may be redacted if deemed necessary by the Authorizer).

Upon reasonable notice, the Authorizer may interview Charter School employees, Board members, students, and families as necessary to resolve complaints and grievances. With respect to complaints and grievances, additional information is contained in Section 8.2.

The Authorizer shall provide in writing to the Charter School no later than July 1 of each school year a Master Reporting Calendar which will set out key deadlines for the Charter School to provide certain information and reports. Additionally, at least thirty (30) days prior to any site visit, the Authorizer shall provide the Charter School with a written list of any required documentation and/or specified actions for the site visit.

The Parties agree that the most critical performance measures contained in the Performance Frameworks are the academic measures, which may include student achievement, student growth measures (including annual measurable objectives), readiness for successive school levels (middle, high, or post-secondary) and employment, as well as mission-specific academic goals defined in the Performance Frameworks.

For the purposes of accountability, renewal, and/or revocation evaluation, the Performance Frameworks supersede all assessment measures, educational goals and objectives, financial operations metrics, and organizational performance metrics set forth in the Charter School's Application and not explicitly incorporated into the Performance Frameworks. However, this shall not prevent the Authorizer from holding the Charter School accountable for any goals contained in the Charter School's Application that do not conflict with Performance Frameworks for purposes of accountability, renewal, and/or revocation evaluation. The specific terms, form and requirements of the Performance Frameworks are maintained and disseminated by the Authorizer and shall be binding on the Charter School.

The Authorizer shall—at least annually—monitor and report on the Charter School's progress in relation to the indicators, measures, metrics, and targets set out in the Performance Frameworks, as well as compliance with federal and state laws and regulations, and when required by the Performance Frameworks and such laws and regulations. The Authorizer will conduct an annual scheduled comprehensive site visit each year, which will be used to the Charter School's progress on the Performance Frameworks.

Changes to the Performance Frameworks to align with changes to applicable state or federal accountability requirements shall apply to the Charter School. In the event of such changes, the Authorizer will use best efforts to apply expectations for school performance in a manner consistent with those set forth in the Performance Frameworks as initially established in the most recent charter agreement.

Changes to the Performance Frameworks that are not required by state or federal law or accountability requirements will not become binding upon the Charter School without the Charter School's consent, except at the time of charter renewal or amendment.

Case 3:25-cv-00530   Document 1   Filed 05/08/25   Page 39 of 57 PageID #: 39



**1.5. Location.** The Charter School location is in the Cane Ridge neighborhood of Nashville, Tennessee. If the Charter School proposes to change its location, such change shall not require an amendment to this Agreement unless the location change is materially different from the location of the Charter School as discussed in the Charter School's Application and described in this agreement. Non-material changes in location shall require at least thirty (30) days prior notice to the Authorizer. Any change in location that is determined by the Authorizer to be materially different from the Charter School's Application shall require an amendment to this Agreement as set forth in Section 10. If the Charter School is located at a site owned or controlled by the local education agency (LEA) in which the Charter School is located or a site owned or controlled by the local government where the Charter School is located, the use of such site shall be subject to and governed by a Facilities Agreement between the parties.

**1.5.1. Inspections.** The Authorizer will have access at all reasonable times to any facility owned, leased, or utilized in any way by the Charter School for purposes of inspection and review of the Charter School's operation and to monitor the Charter School's compliance with the terms of this Agreement.

**1.5.2. Impracticability of Use.** If use by the Charter School of a facility is rendered impracticable by any cause whatsoever, or if the funds necessary to construct/renovate or upgrade a facility cannot be secured, the Charter School shall notify the Authorizer. The Authorizer shall not be obligated to provide an alternative facility for use by the Charter School.

**1.6. Employment Status.** All teachers and other staff of the Charter School shall be employed by the Charter School, and not the Authorizer. None of the provisions in this Agreement shall be construed to create a relationship of agency, representation, joint venture, ownership, or control of employment between the Parties.

**1.7. Mission.** The Charter School, in its work, shall progress toward its established mission. The Authorizer shall evaluate the mission of the Charter School in accordance with the goal and indicators established within the School Performance Framework, as detailed in Exhibit 2, on an annual basis. If over the duration of this agreement, the Charter School needs to change any part of the mission-specific goal in the School Performance Framework, the Charter School shall notify the Authorizer within thirty (30) days. The Authorizer will determine if the change is material such that is requires an amendment to this agreement pursuant to Section 10.

## 2. Charter School Organizational Responsibilities

**2.1. Student Enrollment and Retention.** The Charter School shall enroll students according to T.C.A. § 49-13-113. The Charter School shall not discriminate with respect to admissions on the basis of race, color, ethnicity, religion, national origin, English language

Case 3:25-cv-00530   Document 1   Filed 05/08/25   Page 40 of 57 PageID #: 40



proficiency, sex, disability, or the need for special education and related services as set forth in the Charter School's Application and the Act.

The Charter School may enroll students up to a total maximum enrollment of 684. When the school is serving all authorized grades, increases in total enrollment numbers greater than 600 must be reported to the Authorizer and evaluated to determine if they are material changes to this agreement. Reductions in enrollment greater than 15% must be reported to the Authorizer and evaluated to determine if they are material changes to this Agreement. Until the school is serving all authorized grade levels, the Authorizer will annually evaluate the school against the enrollment listed by year in Exhibit 1. If, after completion of the annual enrollment evaluation, the Charter School's actual enrollment fall below 15% of the projected enrollment, the Authorizer shall have the right to determine if the actual enrollment is a material change to this Agreement. Reductions in enrollment in successive years or changes that affect the financial solvency of the Charter School are considered material and shall require an amendment to this Agreement. Any change in enrollment that is considered to be material to this Agreement shall not be permitted unless a formal amendment to this Agreement is secured in advance according to the provisions outlined in T.C.A. § 49-13-110(d), Commission Rule 1185-01-01-.04, and this Agreement.

The Charter School may enroll students in the grade levels approved in the Charter School's Application.

**Enrollment**

| Grade Level | Year Approved to Enroll |
|---|---|
| 5th Grade | 2023-24 |
| 6th Grade | 2023-24 |
| 7th Grade | 2024-25 |
| 8th Grade | 2025-26 |
| 9th Grade | 2026-27 |
| 10th Grade | 2027-28 |
| 11th Grade | 2029-30 |
| 12th Grade | 2029-30 |

If the number of applications for the Charter School exceeds the capacity of a program, class, grade level, or building, enrollment shall occur according to the preferences in T.C.A. § 49-13-113. If enrollment within a group of preference set out in subdivision (d)(4) exceeds the planned capacity of the Charter School, enrollment within that group shall be determined on the basis of a lottery that complies with statute. The Charter School shall ensure a random selection process, equitable to all students and publicly verifiable, in accordance with federal, state, and local law. The Charter School shall be responsible for adherence to the obligations of a public charter school, in accordance with T.C.A. § 49-13-101 et. seq., including but not limited to enrollment of all eligible students where space is available.


**2.1.1 Student Transfers and Exits.** The Charter School will comply with the Tennessee Department of Education's student transfer and exit reporting requirements and shall provide information to the Authorizer upon request. The Charter School shall enact a discipline policy that complies with Authorizer's policies as well as federal, state, and local laws and may not counsel out enrolled students.

**2.2. Academic Program.** The Charter School shall operate the academic program in accordance with this Agreement, the Charter School's Application, and applicable state and federal law, including providing at least the same equivalent time of instruction as other public schools and complying with assessment and accountability laws and rules (T.C.A. § 49-13-111). If the Charter School is performing below standards, the Authorizer may review the academic program. The Charter School will notify the Authorizer of any material changes to the academic program that are a change from the Charter School's Application, and the Authorizer will evaluate to determine if they are material changes to this Agreement. Any changes to the school structure shall be considered material to this Agreement and shall not be permitted unless a formal amendment to this Agreement is secured in advance according to the provisions outlined in T.C.A. § 49-13-110(d), Commission Rule 1185-01-01-.04, and this Agreement. For purposes of this Agreement, school structure shall be defined as the academic focus or goals of the Charter School and grade levels served.

**2.2.1. Assessments.** The Charter School shall administer all state-mandated assessments to the extent such assessments are required by the Tennessee Department of Education, which currently include but are not limited to TCAP or its successor assessment, writing assessments, and English learner (EL) assessments for the required grades and testing windows. The Charter School shall comply with all Department of Education-required assessment administration, security, and reporting requirements. The Charter School may use additional assessments of its own choosing.

**2.3. Special Education.** Special education services, related services, and accommodations for students who are eligible under the Individuals with Disabilities Education Act (IDEA), Section 504 of the Rehabilitation Act of 1973 (Section 504), the Americans with Disabilities Act (ADA), or any applicable provisions of state law, shall be provided in accordance with applicable state and federal law, this Agreement and Authorizer rules and policies. The Authorizer is the LEA for purposes of ensuring compliance with IDEA, Section 504, and all other federal and state laws and regulations concerning accommodation of and education of students with disabilities.

**2.3.1. Responsibility of the Charter School.** The Charter School assumes responsibility for the provision of services, development, and implementation of individualized education programs (IEPs), 504 plans, child find, evaluation and re-evaluation, and all other obligations under IDEA and/or Section 504 for students identified as eligible for special education services and/or disability accommodations that have enrolled in the school. The Charter School shall have a qualified special education coordinator who will be responsible for monitoring individual case management of all special education students and disabled students and for arranging the provision of services required by their IEP and/or

Case 3:25-cv-00530    Document 1    Filed 05/08/25    Page 42 of 57 PageID #: 42



504 plan. The Charter School shall maintain documentation of the Charter School's compliance with IDEA and Section 504 as required by law. No student shall be denied admission nor counseled out of the Charter School due to the nature, extent, or severity of his/her disability or due to the student's request for, or actual need for, exceptional education services or accommodations pursuant to IDEA, Section 504, or the ADA.

The Charter School shall also implement the requirements of Response to Instruction and Intervention ("RTI²"), as set forth by the Tennessee Department of Education.

The Charter School shall report to the Authorizer any and all formal complaints, relating to IDEA Due Process for special education and Office of Civil Rights complaints for disability accommodations within ten (10) business days of the Charter School's notification of such occurrences.

The Charter School's indemnity of the Authorizer relating to special education and disability accommodations is provided in Section 12.c.

**2.3.2. Costs for Special Education.** The Charter School is financially responsible for child find including student identification, evaluation, and assessment expenses. All costs associated with providing educational services to students with disabilities are the responsibility of the Charter School. The Charter School shall bear the financial responsibility for evaluations and reevaluations and the provision of all services consistent with student IEPs and 504 plans.

The Authorizer will pass federal funding to the Charter School based on the allocation received from the Tennessee Department of Education and in accordance with the Authorizer's funding procedures. Funding is available on a reimbursement basis.

**2.4. English Learners (EL).** The Charter School shall address the needs of EL students pursuant to applicable federal and state laws and regulations (including Title III of the Every Student Succeeds Act (ESSA) and Title VI of the Civil Rights Act of 1964 (Title VI)). The Charter School agrees to maintain and consistently implement a policy to identify students in need of EL services, to provide services in an equitable manner to ensure meaningful access to the school's educational program (including the provision of appropriate accommodations), and to facilitate obtaining English proficiency and exit from EL services according to individual student capacity. In addition, the Charter School shall ensure that Limited English Proficiency (LEP) parents and guardians have meaningful access to school-related information.

**2.5. Student Discipline/Due Process.** The Charter School is responsible for administering its discipline policy in a manner consistent with state and federal law and rules, and the Authorizer's policies that ensure students' due process rights are satisfied, including the provision of appropriate informal or formal hearings. The Charter School shall promptly notify the Authorizer and the LEA in which the student resides of any student expulsion. If the LEA in which the student resides determines that the expelled student is eligible for its Alternative School program, the Charter School shall work with the LEA in which the student

Case 3:25-cv-00530     Document 1     Filed 05/08/25     Page 43 of 57 PageID #: 43



resides to provide an expelled student access to the LEA's alternative school programs, in accordance with T.C.A. § 49-6-3402(h)(1).

**2.6.1. Student Information Systems.** The Charter School shall adopt the Student Information System selected by the Authorizer. The Authorizer shall bear the cost of any needed licenses for the Charter School.

**2.6.2. Student Information Reporting.** To ensure compliance with federal and state law regarding student records, the Charter School shall report to the Authorizer student information enrollment projections for the coming year no later than March 15. Any errors in data reported to the State by the Charter School shall be the sole responsibility of the Charter School to identify and correct.

## 3. Staffing

**3.1. Teachers and Staff.** The Charter School shall ensure that all teachers and staff are licensed and endorsed as required by state statutes, State Board rules, Authorizer policies and rules, and meet applicable federal qualifications including exceptional education certified and ESL certified. The Charter School shall also provide any training required by state or federal law.

**3.2. Background Checks.** All current employees of the Charter School who have or who will have contact with children at the Charter School within the scope of the individuals' employment, and employees of contractors or sub-contractors of the Charter School who have contact with children within the scope of the individuals' employment, shall complete criminal background checks as required by state law using the ORI number of the Charter School.

## 4. Facilities

The Charter School shall ensure the Charter School's grounds and facilities comply with applicable health and safety laws, including the ADA, state fire marshal codes, and state and local zoning and land use codes.

The Charter School shall not commence instruction prior to completion of applicable inspections and receipt of a completed Pre-Opening Checklist (attached as Exhibit 3) from the Authorizer, unless the Authorizer permits the Charter School to open and provide later certification of completion of all items on the Pre-Opening Checklist.

## 5. Food Service

If the Charter School offers food services on its own or through a third-party contract, the Charter School may apply directly to, and if approved, operate school nutrition programs with reimbursement from the United States Department of Agriculture, under supervision of the Tennessee Department of Education.

Case 3:25-cv-00530    Document 1    Filed 05/08/25    Page 44 of 57 PageID #: 44



### 6. Transportation

The Charter School will provide transportation as set forth in the Charter School's Application. If the Charter School has elected to provide transportation for its students, the Authorizer shall provide to the Charter School the funds that would otherwise have been spent to provide transportation as provided in T.C.A. § 49-13-114. In order to receive these funds, the Charter School must comply with state laws and Authorizer rules and policies regarding student transportation. Transporting students in buses that have not been approved for operation by the Tennessee Department of Safety may be grounds for non-renewal or revocation of this agreement. A change to the Charter School's plan to provide or not provide transportation for its students is considered material and requires an amendment. However, a modification in a plan to provide transportation is not considered material.

### 7. Insurance

The Charter School shall maintain the following insurance:

a. General Liability/Automobile Liability Policy: must be equal to or greater than $5,000,000. This insurance shall be primary insurance. Any insurance or self-insurance programs covering the State of Tennessee, its officials, employees, and volunteers shall be in excess of this insurance and shall not contribute to it. The first one million dollars must be with a company licensed to do business in the state of Tennessee. The remaining $4,000,000 can be covered under an excess liability policy (also known as an "umbrella" policy). The policy must name the State of Tennessee as an additional insured. The policy must cover contractual liability. Automobile coverage shall cover vehicles owned, hired, and non-owned.

b. Professional Liability Policies: Directors and Officers Policy must be equal to or greater than $5,000,000. Teachers Professional Liability Policy must be equal to or greater than $1,000,000.

c. Workers Compensation and Employers Liability Policy: The amount of coverage required for Workers Compensation is determined by statute. Charter School must comply with state statutes. Employers Liability must be a minimum of $100,000.

d. Property and Boiler Insurance Policy: If the Charter School purchases the property that will be used by the Charter School, it shall purchase "all risks" property and boiler insurance. Insurance shall be for the full replacement cost of the property and contents with no coinsurance penalty provision.

e. Sexual Abuse: Must have $1,000,000 required coverage.

f. State of Tennessee shall be named as an additional insured on the charter school insurance policy.

Certificates of insurance, in a form satisfactory to the Authorizer, evidencing coverage shall be provided to the Authorizer prior to commencement of performance of this Charter

Case 3:25-cv-00530    Document 1    Filed 05/08/25    Page 45 of 57 PageID #: 45



Agreement. Throughout the term of this Charter Agreement, Charter School shall provide updated certificates of insurance upon renewal of the current certificates.

## 8. Governance

**8.1. General Requirements.** The Charter School shall notify the Authorizer of any change to its status as a nonprofit federal tax exempt organization under IRC § 501(c)(3).

The Governing Body and/or Charter School shall include parent participation in governance through membership on the Governing Body or establishment of a school advisory council pursuant to T.C.A. § 49-13-109.

The Charter School shall comply with all applicable provisions of the Tennessee Open Meetings Act, including statutory provisions concerning the scheduling of Governing Body meetings, meeting agendas, public notice of meetings, and records of those meetings. At the start of each school year, the Charter School shall provide to the Authorizer the list of names of all board members and a schedule of Governing Body meetings for that school year.

As required by T.C.A. § 49-13-111, the Governing Body shall be subject to the conflict of interest provisions contained in T.C.A §§ 12-4-101 and 102.

The Charter School shall be nonsectarian in its programs, admissions policies, employment practices and all other operations. The Charter School shall not be to any extent under the control or direction of any religious denomination.

The Charter School shall not discriminate against any student, employee or any other person on the basis of race, ethnicity, national origin, sex (except with respect to admission of students by single-sex schools), disability or any other ground that would be unlawful if done by any other public school. The Charter School shall take all steps necessary to ensure that discrimination does not occur, as required by law.

**8.2. Complaints.** Except as otherwise provided by this Agreement, the Governing Body shall be the first avenue for formal appeal in case of any complaints or grievances filed against the Charter School or its employees and volunteers. The Governing Body will ensure that the Charter School establishes policies and procedures for receiving and addressing complaints or grievances directed toward the Charter School or its employees and will make those policies available to students, parents/guardians, employees, and any other persons who request it. If grievances persist following an appeal to the Governing Body, or for complaints regarding alleged violations of law or the Charter Agreement, including any violations that may subject the school to revocation or non-renewal under T.C.A. §§ 49-13-121 or 122 may be investigated by the Authorizer. The Authorizer shall also have the ability to investigate complaints in compliance with the Authorizer's policies and procedures. Grievances that are not resolved by the Charter School or Governing Body, or a pattern of serious grievances, may be considered in any application for renewal of this Agreement or any action to revoke the charter.



The Charter School shall notify the Authorizer within seven (7) business days if the Charter School has been named a party to a lawsuit that has been filed in court.

**8.3. Reporting of Corporate Status.** The Charter School shall report any change to the Charter School's corporate legal status or any change in its standing with the Tennessee Secretary of State's Office to the Authorizer within five business (5) days of the change. Any change to the Charter School's corporate legal status as a not-for-profit organization shall constitute grounds for immediate revocation unless, during the term of this Agreement, the Act is amended to allow Charter Schools to be operated by organizations other than not-for-profit organizations.

**8.4 Required Policies and Procedures.** The Charter School shall adopt all required policies, procedures, and plans as required by the Authorizer's LEA policies and procedures pursuant to federal law, state law, and the State Board of Education's rules and policies. The Authorizer will conduct periodic policy and procedure audits to ensure compliance with these requirements.

## 9. Finance

**9.1. State and Local Funds.** The Authorizer shall allocate one hundred percent (100%) of state and local student-generated funds for member schools as provided in T.C.A. § 49-13-112 and as calculated by the formula provided by the Tennessee Department of Education, in accordance with T.C.A. § 49-3-101 et. seq. The Authorizer shall allocate funds to the Charter School after each of the ten (10) attendance-reporting intervals. The Authorizer shall allocate and distribute one-tenth of state and local funds to the Charter School by the 15th of the month in August, September, October, November, December, January, February, March, April, and June, in accordance with Tenn. Comp. R. & Regs. 0520-14-01-.03. Each state and local payment from October through April and the final payment in June is contingent on the Charter School's reporting of the Charter School's Average Daily Membership (ADM) in the Tennessee Department of Education's Education Information System (EIS). Each payment starting in October will be reconciled to the reported ADM for the period before being released. The final (tenth) payment will not be released until the year's ADMs have been reconciled.

**9.2. Federal Funds.**

    a. Eligibility: Each year, the Authorizer shall provide to the Charter School the school's proportionate share of applicable federal ESSA funding (e.g. Title I, Title II, Title III, Title IV, or Title V) and other federal grants received by the Authorizer for which the Charter School is eligible. Schools are eligible for such funds upon approval of their plans for such funds either by the Authorizer or the Tennessee Department of Education (TDOE).

    b. Fund Collection: The LEA in which the Charter School operates shall pay to the TDOE one hundred percent (100%) of the per student share of any

Case 3:25-cv-00530   Document 1   Filed 05/08/25   Page 47 of 57 PageID #: 47


federal funding in the custody of the LEA that is due to the charter school. The TDOE shall withhold from the LEA one hundred percent (100%) of all federal funding in the custody of the TDOE that is due to the charter school. The TDOE shall then allocate and disburse one hundred percent (100%) of these funds to the Authorizer in accordance with procedures developed by the TDOE. The Authorizer may reduce the allocation to charter schools by a percentage allowable under federal rules and regulations for administrative, indirect, or any other category of cost or charges.

c. Fund Distribution & Reporting: Funds shall be distributed on a documented expenditure reimbursement basis with the required documentation. The Charter School shall submit grant reimbursement reports to the Authorizer at least quarterly but no more frequently than monthly. The Authorizer shall distribute to the Charter School federal reimbursement funds within 30 days approval of expenditure reimbursement requests.

d. Use of funds. The Charter School shall comply with all regulations tied to such federal funds, including 2 C.F.R. 200 – Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards, ESSA, IDEA, and any other applicable federal or state laws.

**9.3. Fee for Services Agreement.** Pursuant to T.C.A. § 49-13-142(f), the Charter School may enter into a separate fee for services agreement, for the provision of services (including but not limited to school or student support services such as food services and transportation) to be provided to the Charter School by the LEA in which the Charter School is located. The Charter School may also enter into a separate fee for services agreement with the Authorizer for the provision of services. Fees for services provided to the Charter School by the Authorizer shall be deducted from the State's K-12 education funding formula payments provided to the Charter School. Failure of the Charter School to enter such an agreement with the Authorizer shall not be grounds for revocation or non-renewal of this Agreement.

Annually, the Charter School shall notify the Authorizer of any fee for services agreement(s) entered into with the LEA in which the Charter School is located or with any other vendor or outside contractor specific to the Charter School, including, but not limited to any agreement for the provision of services relating to the service of special populations and shall provide a copy to the Authorizer of any agreement(s) entered into. This shall only apply to those contracts or agreements that have a value of more than $10,000, however, the Charter School shall provide a copy of any fee for services agreement(s) with a value of $10,000 or less at the Authorizer's request.

**9.3.1. External Service Provider (ESP) Contracts.** The Charter School may contract for services, as provided by T.C.A. § 49-13-124. In such case, the Charter School shall notify the Authorizer of the contract(s) no later than seven (7) business days of signing the contract(s) and shall provide a copy of the contract(s) to the Authorizer upon the Authorizer's request.

Case 3:25-cv-00530    Document 1    Filed 05/08/25    Page 48 of 57 PageID #: 48



The external service provider ("ESP") is a vendor of services, but the Governing Board remains ultimately responsible for the success or failure of the school. All contract(s) between the ESP and the Charter School should articulate:

a. The roles and responsibilities of the Charter School and the ESP, including all services to be provided under the contract;
b. The performance measures, consequences, and mechanisms by which the Charter School will hold the ESP accountable for performance, aligned with the performance measures in this Agreement;
c. All compensation to be paid to the ESP, including all fees, bonuses, and what such compensation includes or requires;
d. Terms of any facility agreement that may be part of the relationship;
e. Financial reporting requirements and provisions for the school's governing board's financial oversight;
f. Require all instructional materials, furnishings, and equipment purchased or developed with public funds to be the property of the Charter School, not the ESP, in compliance with state law.
g. All other financial terms of the contract, including disclosure and documentation of all loans or investments by the ESP to the Charter School, and provision for the disposition of assets in accordance with law;
h. Assurances that the Charter School, at all times, maintains independent fiduciary oversight and authority over the Charter School budget and ultimate responsibility for the Charter School's performance;
i. Provisions for contract termination; and
j. Respective responsibilities of the Charter School and ESP in the event of school closure, including transparency in the Charter School's revenues and expenditures as well as those managed by the ESP.

Governing Board members shall not be employed, selected, approved, or compensated by the ESP. Governing Board members are prohibited from serving as members of the Charter School and a member of the ESP.

To the extent there is a conflict between the terms of this Agreement and an ESP contract, the terms of this Agreement shall govern.

**9.4. Tuition.** The Charter School shall not charge tuition unless otherwise permitted by Authorizer policy.

**9.5. Charter School Debt.** The Charter School is solely responsible for all debt it incurs, and the Authorizer shall not be contractually bound on the Charter School's account to any third party. The Authorizer shall not be liable in any instance for the Charter School's unpaid debts if the Charter School does not have sufficient funds to pay all of its debts.

The Charter School shall notify the Authorizer immediately of a default on any obligation owed to the Authorizer, which shall include debts for which payments are past due

Case 3:25-cv-00530    Document 1    Filed 05/08/25    Page 49 of 57 PageID #: 49



by sixty (60) days or more. If debts are incurred in the provision of employee benefits pursuant to T.C.A. § 49-13-119, the Authorizer may withhold the amount owed from the monthly payment until such debts are satisfied. Any other debts owed to the Authorizer must be satisfied prior to release of the last annual payment.

**9.6. Financial Management.** The Charter School shall control and be responsible for financial management and performance of the Charter School including budgeting and expenditures. Before receiving the State's K-12 education funding formula funds through the Authorizer, the Charter School must demonstrate (if not already demonstrated in the Charter School's Application) the existence of appropriate governance and managerial procedures and financial controls including:

a. Accounting methods complying with T.C.A. § 49-13-111(o);
b. A checking account;
c. Adequate payroll procedures;
d. An organizational chart;
e. Procedures for the creation and review of monthly and quarterly financial reports, including identification of the individual responsible for preparing such financial reports in the following fiscal year;
f. Internal control procedures for cash receipts, disbursements, and purchases; and
g. Maintenance of asset inventory lists and financial procedures for federal grants in accordance with applicable federal law.

The Authorizer reserves the right to require, consistent with the Act, the submission of financial reports as indicated in Authorizer policies.

The Charter School shall comply with T.C.A. §§ 49-13-111 and 120 regarding completion and submission of annual budgets, financial reports, and audits to the Authorizer and the State. The Charter School shall undergo an independent financial audit conducted in accordance with T.C.A. §§ 49-13-111(l) and 49-13-127. The audit shall be furnished to the Authorizer, the Commissioner of Education, and the Comptroller of the Treasury by December 31 of each year in accordance with the Authorizer's reporting calendar. If such audit is not received by the Authorizer on or before December 31 of each year, it shall be considered a material breach of this Agreement, which the Charter School shall have 15 business days, or such other time as the Parties may agree, to cure. The audit should express an unqualified opinion on the financial statements. A qualified audit opinion will result in an automatic review and request for explanation from the Charter School. In addition, any material weaknesses in controls should be disclosed during the audit. A material weakness will result in a potential review and explanation from the Charter School. The Charter School shall also prepare and provide to the Authorizer a copy of its final annual budget for the upcoming fiscal year no later than July 1 of each year. In addition, the Charter School shall submit any other financial and/or operational reports pursuant to T.C.A. § 49-13-111(d).

Case 3:25-cv-00530   Document 1   Filed 05/08/25   Page 50 of 57 PageID #: 50



9.7. **Financial Records.** All financial records of the Charter School pertaining to the management and operation of the school are subject to inspection and production as required for fulfillment of the Authorizer's fiduciary responsibilities, upon reasonable notice.

9.8. **Authorizer Fee.** Pursuant to T.C.A. § 49-13-128(e), the Charter School agrees to the payment of an annual authorizer fee of up to 3% of the charter school's per pupil state and local funding. By May 1 of each year, the Authorizer shall set the percentage of the authorizer fee. The Authorizer shall use the authorizer fee to fulfill obligations consistent with the authority of the Authorizer set forth in Title 49, Chapter 13.

## 10. Amendments

Pursuant to T.C.A. § 49-13-110, petitions to amend this Agreement, initiated by the Charter School, shall follow the timelines established in Commission Rule 1185-01-01-.04 for approval or denial by the Authorizer. An amendment shall not become effective, and the Charter School shall not take action or implement the change requested in the amendment, until the amendment is approved in writing by the Authorizer.

Not all changes to the Charter School's operation constitute material changes to this Agreement that require an amendment. However, the following changes (as well as any other changes mentioned in other sections of this Agreement as being material and requiring an amendment as well as changes outlined in Commission Rule 1185-01-01-.04 are considered material and shall require an amendment:

        a. Material changes in the Charter School's mission, as defined in Section 1.7;
        b. Changes in the Charter School's calendar that reduce the calendar by 5 or more days in the first year of operation or by more than ten (10) days in subsequent years, in the absence of timely notification of parents; and
        c. Changes in school location that are materially different from the location of the Charter School as discussed in the Charter School's Application and this Agreement pursuant to Section 1.5.

Educational program matters not specifically identified in this Agreement or the Charter School's Application shall remain within the Charter School's authority and discretion.

The following changes do not require an amendment; however, the Charter School shall notify the Authorizer of any of the following within thirty (30) days:

        a. Changes to the June 1st budget submitted to the Authorizer, subject to the requirements of state and federal law;
        b. Changes in the mailing address of the school, phone or fax number, or web address of the Charter School;
        c. Changes in the members and duties of the Governing Body relating to oversight of the Charter School, including names and contact information;

Case 3:25-cv-00530    Document 1    Filed 05/08/25    Page 51 of 57 PageID #: 51



    d. Changes in the school leader or, if applicable, the chief executive of the Charter School or charter management organization including names and contact information;

    e. Changes in any leadership in the Charter School or individuals serving as main contacts with the Authorizer, including names and contact information; and

    f. Changes in school location to a location permitted by Section 1.5.

Any material change initiated by the Authorizer, requiring an amendment to this Agreement, must be agreed to in writing by both parties. An amendment shall be effective at the agreed upon date in the amendment or upon approval in writing by the Authorizer.

## 11. Renewal, Revocation, Closure, and Dissolution

**11.1. Renewal.** Pursuant to T.C.A. § 49-13-121, the Charter School may apply for renewal of this Charter Agreement by application submitted no later than April 1 of the year prior to the year in which this Agreement expires and in accordance with Authorizer renewal rules and policies. This Agreement may be renewed without modification, except for the incorporation by attachment of the approved renewal application. The Parties may also amend this Agreement as part of the renewal process.

The Authorizer may elect not to renew this Charter Agreement pursuant to the Authorizer rules, policies, and T.C.A. § 49-13-121. Any changes to this Agreement proposed during the renewal process that are rejected by one of the Parties shall constitute denial of the renewal application. Denial of the renewal application by the Authorizer shall be final and not subject to appeal.

**11.2. Revocation.** During the term of this Agreement, in accordance with the Authorizer's policies, the Authorizer will provide notice to the Charter School of non-compliance with applicable laws, rules, or this Agreement and give the Charter School an opportunity to cure the non-compliance prior to instituting revocation proceedings pursuant to T.C.A. § 49-13-122 and Authorizer rules and policies, unless the Authorizer determines that the violations are so severe that such notice and an opportunity to cure should be waived. Such notice and opportunity to cure shall not be required for grounds upon which this Agreement or state law calls for immediate revocation of the charter.

At any time during the term of this Agreement, the Authorizer may revoke this Agreement for any reason set forth in T.C.A. § 49-13-122, and/or a material violation of any of the conditions, standards, or procedures set forth in this Agreement.

If the Authorizer determines that any grounds for revocation exist, it may revoke this Charter Agreement according to the procedures set forth in T.C.A. § 49-13-122 and Authorizer policies.

Case 3:25-cv-00530    Document 1    Filed 05/08/25    Page 52 of 57 PageID #: 52



**11.3. Closure and Dissolution.** In the event that the Charter School is required to cease operation for any reason, including but not limited to closure, non-renewal, revocation, or voluntary surrender of the charter, the Charter School shall cooperate with the Authorizer to ensure orderly closure of the Charter School including, but not limited to:

   a. Timely notification of parents and teachers of the closure decision;
   b. Securing student records and transferring them to the LEA in which the Charter School is located;
   c. Assisting in placing students in appropriate schools;
   d. Managing all financial records consistent with the Authorizer's school closure requirements and policies; and
   e. Disposal of school assets in accordance with the Act and this Agreement.

The Charter School shall also comply with any closure policies or protocols established by the Authorizer.

Dissolution of the Charter School following revocation, expiration of this Agreement, dissolution or cessation of operations, or non-renewal shall comply with T.C.A. §§ 49-13-110(e) and 49-13-122. The Charter School shall be responsible for winding down operations, including payment of any and all debts, obligations, or liabilities incurred at any time by the Charter School. Under no circumstances shall the Authorizer be responsible for such obligations. Charter School personnel and the Governing Board shall cooperate fully with any activity related to school closure or phase out. If assets of the Charter School were funded with funds from the Authorizer, other than funds described in Sections 9.1 and 9.2, and such assets remain after paying the Charter School's debts and obligations and not requiring return or transfer to donors or grantors, such assets will become the property of the Authorizer.

## 12. Indemnification and Hold Harmless

The Authorizer and Charter School each shall give immediate written notice to the other of the assertion of any claim or the commencement of any litigation for which indemnification is sought and shall cooperate with each other in the defense of the claim or litigation.

Each party to this Agreement shall indemnify and hold harmless the other, and their respective officers, agents, and employees from and against any and all claims, actions, damages, expenses, losses or awards—including attorney fees—arising out of (i) the negligence of the other party, (ii) any action taken or not taken by the other party, or (iii) any noncompliance or breach by the other party of any of the terms of this Agreement, or laws applicable to the party's operations during the term of this Agreement.

In the event of any such suit or claim, the Charter School shall provide all assistance required by the State in the State's defense. Nothing contained herein shall be deemed to

Case 3:25-cv-00530    Document 1    Filed 05/08/25    Page 53 of 57 PageID #: 53



afford to the Charter School, through its attorney(s), the right to represent the State of Tennessee in any legal matter, such rights being governed by T.C.A. § 8-6-106.

### 13. Contract Construction

**13.1. Waiver.** The failure of either of the Parties to this Agreement to insist on strict performance of any term or condition of this Agreement shall not constitute a waiver of that term or condition, even if the Party accepting or acquiescing in the nonconforming performance knows of the nature of the performance and fails to object to it.

**13.2. Non-assignability.** No right or interest in this Agreement shall be assigned by anyone on behalf of the Charter School, and delegation of any contractual duty of the Charter School shall not be made without prior written approval of the Authorizer. A violation of this provision shall be grounds for immediate termination of this Agreement and revocation of the Charter.

Should the Charter School propose to enter into a contract with another non-profit entity to manage the school, this constitutes a material change that requires an amendment to this Agreement. The Charter School agrees to submit all information requested by the Authorizer regarding the management arrangement, including a copy of the proposed contract and a description of the management company, with identification of its principals and their backgrounds. The Charter School shall not enter a management contract without written approval from the Authorizer. Failure to receive approval from the Authorizer prior to entering into a contract shall be grounds for immediate revocation.

**13.3. Agreement.** The Parties intend this Agreement, including all attachments and exhibits hereto, to represent a final and complete expression of their agreement, which shall be considered the Agreement. All prior representations, understandings, and discussions are merged herein, and no course of prior dealings between the Parties shall supplement or explain any terms used in this document. The Parties recognize that amendments to this Agreement may be executed from time-to-time hereafter.

**13.4. Survival of Representations and Warranties.** All representations and warranties hereunder shall be deemed to be material and relied upon by the Parties with or to whom the same were made, notwithstanding any investigation or inspection made by or on behalf of such Party or Parties. The representations and warranties covered in this Agreement will survive the termination or expiration of this Agreement.

**13.5. Severability.** The provisions of this Agreement are severable. Any term or condition deemed illegal or invalid shall not affect any other term or condition, and the remainder of the Agreement shall remain in effect unless otherwise terminated by one or both Parties. For any term or condition deemed illegal or invalid, the Parties shall, upon the request of either party, negotiate in good faith to adopt any necessary or appropriate replacement provision.

Case 3:25-cv-00530   Document 1   Filed 05/08/25   Page 54 of 57 PageID #: 54



**13.6. Authority.** The individual officers, agents, and employees of the Parties hereto who execute this Agreement do hereby individually represent and warrant that they have full power and lawful authority to execute this Agreement.

**13.7. Change of Law.** If, due to any change in applicable law, regulation, or interpretation thereof by any court of law or other governing body having jurisdiction subsequent to the date of this Agreement, performance of any provision of this Agreement or any transaction contemplated hereby shall become impracticable or impossible, the parties hereto shall use their best efforts to find and employ an alternative means to achieve the same or substantially the same result as that contemplated by such provision.

**13.8. Notice.** Any notice required or permitted under this Agreement shall be in writing, sent via electronic or other means, and shall be effective immediately upon personal delivery, subject to verification of service or acknowledgment of receipt, or three (3) days after mailing when sent by certified mail, postage prepaid. Such noticed shall be sent to:

If to the Authorizer:
    <u>Mailed to:</u>
    Tennessee Public Charter School Commission
    Attn: General Counsel
    500 James Robertson Parkway, 5th Floor
    Nashville, TN 37243
    <u>and emailed to:</u>
    ashley.thomas2@tn.gov

If to the Charter School:
    <u>Mailed to:</u>
    Roy Renfro
    Tennessee Nature Academy
    5844 Pettus Road
    Antioch, TN 37013
    <u>and emailed to:</u>
    rrenfro@tennesseenatureacademy.org

Either party may change its address for notices under this Agreement by notice to the other party.

**13.9 No Third-Party Beneficiary.** This Agreement shall not create any rights in any third parties who have not entered into this Agreement, nor shall any third party by entitled to enforce any rights or obligations that may be possessed by either party to this Agreement.

Case 3:25-cv-00530   Document 1   Filed 05/08/25   Page 55 of 57 PageID #: 55



TENNESSEE
PUBLIC CHARTER SCHOOL COMMISSION

THE STATE OF TENNESSEE BY AND THROUGH
THE TENNESSEE PUBLIC CHARTER SCHOOL
COMMISSION:

By: _____
Printed Name: Tess Stovall
Title: Executive Director
Date: 2/22/23

By: _____
Printed Name: Thomas Griscom
Title: Chairman, Tennessee Public Charter
School Commission
Date of Commission Approval:
January 27, 2023

CHARTER SCHOOL:

By: _____
Printed Name: ROGERS WARRICK, JR.
Title: BOARD CHAIR
Date: 2/17/2023

Sworn to and subscribed to before me, a
Notary Public, this ___17th___ day of
___February___ 2023 by
_Roger S Warrick Jr_ the
_Board Chair_ of Charter School
and duly authorized to execute this instrument
on Charter School's behalf.

_____
Notary Public
My Commission Expires 1/11/2026



**TENNESSEE**
PUBLIC CHARTER SCHOOL COMMISSION

## EXHIBITS

**Exhibit 1**- Approved Charter Application ("Charter School Application")
**Exhibit 2**- Current Approved Performance Frameworks
**Exhibit 3**- Pre-Opening Checklist/ Protocol
**Exhibit 4**- Approved Waivers